Herbert J. ROWE, Ann Muter Rowe and Continental Illinois National Bank and Trust Company of Chicago, as Trustees under the Will of Leslie F. Muter, Deceased; Herbert J. Rowe and Ann Muter Rowe, Plaintiffs,

v.

MAREMONT
CORPORATION, Defendant.

No. 77 C 2837.

United States District Court,
N.D. Illinois, E.D.

June 3, 1986.

Robert Gettleman, Jean Maclean, D'Ancona & Pflaum, Chicago, Ill., for plaintiffs.

Bernard J. Nussbaum, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This securities action, brought under Rule 10b–5 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and principles of pendent jurisdiction, is before the court for entry of findings of fact and conclusions of law in accordance with Fed.R. Civ.P. 52(a). The matter, initially filed as a cross-claim, is all that remains of the action, and was tried to the bench over a five day period in August of 1983, with additional testimony given in January of 1984. Post-trial memoranda were prepared and filed thereafter. For the reasons set forth herein, the court finds by a preponderance of the evidence in the plaintiffs' favor on their securities claim and awards damages of $745,423.80 plus interest.

## FACTS

The claim at issue grows out of a face-to-face transaction in July 1977 whereby Maremont purchased 216,965 shares of stock in Pemcor, Inc. owned by plaintiffs. The basic issues at trial were (1) whether Maremont misrepresented and knowingly concealed its intention to use their stock as a springboard for a control acquisition, and (2) whether Maremont misrepresented and knowingly concealed the existence of an FTC order which created certain legal complications in the deal. The following factual summary is intended to represent the court's recitation of both undisputed facts and disputed facts as I have resolved them based on the preponderance of the evidence presented at trial. The court heard live testimony from various of the plaintiffs' representatives and from one of Maremont's employees. Defendant did not call any of its own witnesses but did introduce designated deposition testimony into evidence. References to trial testimony and deposition testimony are accordingly noted.

### *Pre-Negotiation Background*

Plaintiff Herbert J. Rowe is a former Chairman of the Board, President, and

Chief Executive Officer of the Muter Company, which merged with the Potter-Englewood Corporation on June 30, 1971 to become Pemcor, Incorporated. During all times relevant herein, Pemcor was a publicly held Delaware corporation which manufactured and distributed electrical products, including stereo speakers sold primarily for installation in automobiles. Mr. Rowe was Chairman of the Board and an officer of Pemcor from June 30, 1971 to July 1975. From August 1974 to January 1978 Mr. Rowe was employed by the National Aeronautics and Space Administration ("NASA"). (Stipulation of Uncontested Facts, ¶¶ 1, 3).

Plaintiff Ann Muter Rowe is the wife of Herbert J. Rowe and a daughter of the late Leslie F. Muter, founder of the Muter Company. The Rowes reside in McLean, Virginia. Plaintiff Continental Illinois National Bank and Trust Co. of Chicago is a national banking association located in Chicago, Illinois, and brings suit along with the Rowes in its capacity as a co-trustee under the Will of Leslie F. Muter (the "Muter Trust"). Mrs. Rowe is the life income beneficiary under the trust and her children are the remainder beneficiaries. (Stipulation, ¶¶ 4–5).

Among the assets in the trust as of early 1977 were 216,965 shares of Pemcor stock; the Rowes also owned 8,921 shares of Pemcor in their individual capacity. These shares together comprised 11½% of Pemcor's outstanding stock, and will hereafter be referred to as the "Rowe shares" or the "Rowe block." Although Pemcor was listed on the New York Stock Exchange, the Rowe shares were not registered under the Securities Act of 1933 and therefore could not be sold in the open market. The shares were further subject to an agreement dated June 30, 1971 between the Rowes and Potter-Englewood Corporation. (Trial Exhibit 1). This agreement required, as a precondition to any disposition of the stock, notice to Pemcor and an opinion of counsel selected by Pemcor that sale of the stock would not violate the 1933 Act. (Stipulation ¶ 6).

By early 1977 the Rowes, no longer involved with Pemcor as insiders, had decided to sell their Pemcor shares in order to diversify the Trust holdings. (A. Rowe Tr. 65; Hoovel Tr. 330–332). The Rowes explored both the possibility of a private placement and a secondary public offering, and contacted various investment bankers. (A. Rowe Tr. 158–61; H. Rowe Tr. 881–83; Fuchs Tr. 1048–51). The bankers were unable, however, to locate a private placement purchaser. (H. Rowe Tr. 889).

On or about July 7, 1977, the Rowes wrote a letter to Edward F. Anixter, the president and chief executive officer of Pemcor. (Trial Ex. 83). The letter informed Anixter that the Rowes had decided "to sell all or substantially all" of the Rowe block. In the letter, the Rowes requested either that the restrictive legend on the stock be removed so that the shares could be sold without prior consent of Pemcor, or that Pemcor cooperate with a secondary offering. In particular, the letter asked if Pemcor would prepare required registration statements and absorb such costs of the offering as would be appropriate. Anixter refused to remove the restrictive legend, but agreed to discuss the offering at Pemcor's July 22, 1977 annual board meeting. (Anixter Tr. 775–76; Kaufman Dep. 18). The Rowes had been advised at this time that an offering price at $5 to $6½ per share was possible, that the offering would take five or six months, and that offering expenses could range from $100,000 to $250,000. (Trial Ex. 70, p. 12; Ex. 80, p. 13; H. Rowe Tr. 1032, Fuchs Tr. 1051). At this time Pemcor stock was trading on the market at around $12–13 per share. (Trial Ex. 136).

Around the same time that the Rowes were considering how to dispose of their Pemcor stock, Maremont Corporation, a publicly held Delaware corporation which manufactures and distributes automotive exhaust systems and shock absorbers, was interested in expanding operations through an acquisition program. In late 1976 or early 1977, Maremont retained the services of Skadden, Arps, Meagher & Flom, a New

York law firm which specializes in mergers and acquisitions. In January 1977, Maremont, acting through its president Richard Black, executed a commission agreement with The Illinois Company, a Chicago brokerage firm. (Trial Ex. 4). The Illinois Company recommended Pemcor as an acquisition candidate and arranged a meeting between executives of the two companies. In anticipation of the meeting, Maremont prepared a series of "acquisition analyses," all of which examined the impact that a 100% purchase of Pemcor would have on Maremont's growth and earnings. (Trial Exs. 6–16; Williams Dep. (11/2/77) 47–48; Black Dep. 114, 119–22; Stipulation ¶ 12).

The first Pemcor-Maremont meeting occurred on March 8, 1977. Present at the meeting were Black; Jerry Williams, Maremont's Vice-President of Corporate Planning and Business Systems; William Penner and Tom Gordon of The Illinois Company; Pemcor president Anixter; and Henry Kohorn, Pemcor director. The meeting apparently remained cordial but no conclusive agreements were reached.

A second meeting was held between Black and Anixter alone on April 29, 1977. (Black Dep. 173–74, 180–83; Anixter Tr. 724–25). Anixter promised to get back to Black at some point in the future. Black testified at his deposition that he hoped Anixter would agree to some merger or affiliation after the meeting. (Black Dep. 166–67). Anixter, however, was not interested in a merger at this time, and made no effort to contact Black. (Anixter Tr. 723). In consequence, Maremont, although still interested in a combination with Pemcor, ceased active consideration of Pemcor as an acquisition candidate. (Mills Tr. 585–588).

On or about July 13, 1977, The Illinois Company informed Black of the possible availability of the Rowe block. Black instructed Williams to update the earlier acquisition analyses, arranged for Skadden, Arps to handle the transaction, and obtained approval from the Maremont board to purchase the Rowe block. (Black Dep. 132–33, 148–49, 177–78, 201, 208–211, 280–

282; Williams Dep. 11/2/77 146–48; Mills Tr. 599). Black's intent at this time, as it had been before, was "to explore with Mr. Anixter and/or the Directors the possibility of Maremont acquiring ... control of Pemcor." (Black Dep. 132).

After receiving Williams' update and the directors' approval, Black instructed Penner to proceed. (Black Dep. 218–19). Pursuant to this instruction, on Monday July 18, 1977, Gordon Teach of The Illinois Company contacted Darryl Hoovel, an investment officer in the trust division of Continental, and offered on behalf of an undisclosed principal to purchase the Rowe shares for the closing market price on that date of $13 per share. Hoovel conveyed the offer to Gordon Martin, another Continental officer, who in turn conveyed the offer to Mrs. Rowe at her home in McLean, Virginia, and to the Rowes' attorney in Chicago, Robert Fuchs.

All parties agreed that the price was very good. The stock was in fact at an all time historical high, and the market price had doubled since January of 1977. (Ex. 136). However, because of the necessary investment representations involved in the sale of restricted stock and because of Mrs. Rowe's long ties with Pemcor, she refused to sell the Rowe shares "blind," i.e., without knowing the name of the purchaser. Mrs. Rowe phoned Teach and arranged to come to Chicago the next day to meet him, thus beginning the first of three days over which the Rowes and/or their representatives met with representatives of Maremont corporation to arrange for the sale of the stock.

### The Rowe-Maremont Negotiations

*July 19, 1977 Meeting.* On Tuesday, July 19, 1977, Mrs. Rowe met at Continental Bank with Teach, Fuchs, Hoovel and Martin. She had with her a written authorization to act on behalf of her husband as co-trustee. At this meeting, Teach revealed Maremont's name only after Mrs. Rowe insisted on knowing the purchaser and after he had obtained Maremont's approval. Teach also requested that the

Rowes not disclose Maremont's name to anyone else until 24 hours after the agreement was reached. (Trial Ex. 25, p. 2).

Mrs. Rowe, upon learning Maremont's name, remarked that the two companies would make a "good fit" because of their combined expertise in the automotive business. (A. Rowe Tr. 87; Hoovel Tr. 340). Teach informed the Rowes that Maremont had recently sold one of its divisions, that it wanted the shares for investment purposes, and that it intended to purchase enough Pemcor stock to get a director of its choosing elected to the Board. Mrs. Rowe informed him that the Rowe block would not assure election of a director, because her own efforts to name herself as a Pemcor director had failed. Teach responded by saying that Maremont knew that and intended to buy "up to" or "as much as" twenty percent. Teach also mentioned two Pemcor directors with whom Maremont was negotiating additional purchases. (Hoovel Tr. 207–08; Trial Ex. 137–A, p.3). Teach never promised, however, that Maremont would cease its purchases of Pemcor at 20%.

At the close of the meeting, Mrs. Rowe agreed to sell the Pemcor shares to Maremont at $13 a share, the closing price from the day before, less a ⅛ commission to be paid by the Rowes to The Illinois Company. (A. Rowe Tr. 94; Fuchs Tr. 1193). At some point during this meeting she indicated that she wanted to avoid controversy. (A. Rowe Tr. 89). There was no testimony, however, as to the exact context in which that statement was made, and the statement was apparently neither repeated nor emphasized.

Teach was anxious to finalize the deal that day, as he was going on vacation. However, further documentation was necessary before the deal could be closed. In particular, the Rowes were bound under the 1971 agreement to notify Pemcor before any sale of the stock, and to enable counsel chosen by Pemcor to determine that such transfer would not require registration under the 1933 Act. This required in turn that Maremont make certain invest-

ment representations, i.e., that it was not buying the stock with a view to a subsequent disposition in the market. Teach informed the Rowes that William Penner would substitute for him at the next day's meeting. Mrs. Rowe returned to Washington, and Fuchs began drafting the appropriate documents.

*July 20–21, 1977.* The next day, the following people met at Fuchs' office to negotiate the sales agreement: Fuchs; Marvin Temple, an associate in Fuchs' law firm; William Penner of The Illinois Company; Jack Mills, Maremont's General Counsel; Maremont Vice-President Jerry Williams; Milton Shapiro, Maremont's Treasurer; and David McDonald, a lawyer for The Illinois Company. Of the Maremont representatives, only Williams had known about Maremont's interest in acquiring Pemcor from its inception. Shapiro first heard of Pemcor sometime earlier that week. (Shapiro Dep. 15–18). Mills had learned of Pemcor the week before when he had been asked by Black to inquire into the possible effects of an FTC order on Maremont's purchase of Pemcor stock. (Mills Tr. 568, 604).

Early that morning, Shapiro and/or Penner repeated Teach's statement that Maremont intended to make an investment in Pemcor stock with the cash available from the sale of a division, that it was negotiating with other Pemcor directors to purchase the stock, and that it wanted to elect a director to Pemcor's board. (Temple Tr. 904, 912; Fuchs Tr. 1102). Maremont had in fact recently sold its Spalding division for about $3,000,000 in cash, approximately one and one-half times the Rowe purchase price, (Mills Tr. 642), but there is no evidence that excess cash had anything to do with Maremont's motives in acquiring Pemcor. Shapiro further represented at some point during this meeting that the funds would be wire transferred from California, even though the funds for the purchase were taken from Maremont's revolving credit account with Continental Bank here in Chicago. (*Compare* Rowe Tr. 682–83 and Fuchs Tr. 1107 *with* Ex. 54 p.2). The

twenty percent figure was again mentioned as well. (Temple Tr. 904).

Black testified at his deposition that the 20% figure was in fact a "fallback position" for him because a 20% investment would guarantee Maremont's ability to consolidate Pemcor earnings for accounting purposes should a merger fail to materialize. (Black Dep. at 128, 130). Williams and Black had discussed how the Rowe purchase "wasn't going to be much of an investment" absent additional purchases "to take it to the balance sheet" (Williams Dep. 155–56), and Penner had advised that the available shares from the other directors might reach that figure. (Black Dep. 300–01). None of Maremont's representatives, however, remembered *any* statements to the Rowes about a possible 20% acquisition, (Williams Dep. 243; Shapiro Dep. 206; Pirie Dep. at 109–11), and counsel's trial position was simply that the 20% figure was never mentioned as a limit. There is no evidence to support the statement that Maremont wanted enough stock to elect a director of its choosing to the Pemcor board.

As the negotiations continued, Penner, McDonald, and Williams all left the meeting; sometime later that afternoon, Robert S. Pirie and Milton G. Strom, attorneys with the Skadden, Arps firm, arrived to handle the transaction for Maremont. Shapiro introduced Pirie and Strom as New York lawyers who were in Chicago on other Maremont business and were "stopping by" to help Maremont conclude the transaction. (Temple Tr. 904–05; Fuchs Tr. 1102). In fact, the attorneys had been asked to handle the Rowe transaction specifically in connection with a possible Maremont-Pemcor acquisition. (Black Dep. 280–282; Williams Dep. (11/2/77) 146–48; Mills Tr. 599; Pirie Dep. 29–31; Strom Dep. 7–10; Exs. 26–27). Shapiro admitted at his deposition that he "might have" referred to Pirie and Strom as just stopping by. (Shapiro Dep. 224). Herbert Rowe, who had been in Missouri on business for NASA, arrived sometime later that afternoon. (H. Rowe Tr. 675).

The Rowes knew that Maremont wanted to close the deal rapidly. (H. Rowe Tr. 674). The Rowes could not close, however, because the 1971 merger agreement gave Pemcor's counsel control over the issuance of the opinion letter. To solve this problem, Fuchs drafted an escrow agreement which would lock in the $13 price, commit the parties to the deal, but delay actual "closing" until Pemcor had had an opportunity to issue an opinion letter. (H. Rowe Tr. 837; Temple Tr. 959; Fuchs Tr. 1221; Pirie Dep. 71–74). The term of the escrow as originally provided was two years. The purpose of the extended term was to accommodate possible delay or "heel-dragging" by Pemcor in issuing the opinion letter. (Temple Tr. 962–63; Fuchs Tr. 1109; H. Rowe Tr. 839–40). The Rowes and their representatives all testified that they expected to have the opinion letter within a short time since they knew of no legitimate grounds on which Pemcor could argue that the sale did not comply with the SEC laws. (H. Rowe Tr. 687–88, 690; Fuchs Tr. 1109). The New York lawyers, Pirie and Strom, however, both testified to the impression that the Rowes' relations with Pemcor were bad, and that the Rowes were afraid of substantial delay. (Pirie Dep. 73, 112–13; Strom Dep. 37–38).

Neither Maremont nor Herbert Rowe was happy with the two year escrow. (Pirie Dep. at 73–74; H. Rowe Tr. 834–35; Fuchs Tr. 1109). Fuchs thereupon drafted a proposal that each side be allowed to terminate the escrow if the opinion letter still hadn't issued after six months. (Ex. 87). Maremont, which would have been ready to pay cash had control over the opinion letter not been vested in Pemcor, refused. Ultimately it was settled that Maremont could withdraw after six months and the Rowes after nine. (Pirie Dep. at 73–74; Trial Exhibit 31). Mr. Rowe recalled agreeing to the discrepancy at Fuchs' urging. (H. Rowe Tr. 838).

With respect to the escrow, Maremont also insisted on being given the unilateral option to take possession of the Rowe shares after August 1, 1977. (Ex. 30, ¶ 10).

Maremont would not yield to the Rowes' requests for similar rights, but agreed to indemnify the Rowes should litigation arise with Pemcor following exercise of that option. (Ex. 31; Pirie Dep. 117–121).

Herbert Rowe stayed overnight in Chicago. On the morning of July 21, he met for breakfast with Anixter to inform Anixter of the impending private placement and to tell Anixter that there was thus no need for the Pemcor board, at its annual meeting the next day, to act on the Rowes' requested secondary offering. As agreed upon with Maremont, Rowe did not disclose the name of the purchaser to Anixter. (Rowe Tr. 705; Anixter Tr. 728, 755). Rowe was also to ask Anixter to cooperate in issuance of the opinion letter. Anixter, however, recalled no such request. (Tr. 728).

At the meeting, Anixter attempted to dissuade Rowe from selling until after the company announced its earnings at the annual meeting, but Rowe refused on the ground that he had already made a deal and was going to stick with it. (Anixter Tr. 728, 756). Anixter recalled on cross-examination saying to Rowe that any company interested in purchasing 11½% would probably want to buy the rest of Pemcor, to which Rowe made no reply. (Anixter Tr. 751–53). Rowe did not recall this remark. (H. Rowe Tr. 836).

Rowe recalled Anixter asking if there was going to be a takeover, to which Rowe responded that he had been told that the buyer intended to purchase only up to 20% of the stock. (H. Rowe Tr. 872). Anixter, however, remembered that Rowe made no response to his question about a probable takeover, and said nothing about a 20% interest or about the purchaser wanting a director on the Pemcor board. (Anixter Tr. 753–55). Anixter testified that the first he heard of a 20% limit was at his deposition in this action. (*Id.* at 750–54).

Upon returning to Fuchs' office, Rowe did not tell the Maremont representatives about his meeting with Anixter. He did point out to Maremont that the stock had risen over a point and a half since Monday's closing price (Wednesday's closing price had been at 14.6). (Trial Ex. 136). Rowe stated, however, that he was still satisfied with the deal at $13. Pirie interpreted this remark as indicating that Rowe did not care what Maremont did in the future with its Pemcor stock. (Pirie Dep. 108). There was no questioning by or of either Mr. Rowe or Fuchs as to what might have been causing the rise in price.

Maremont's future intentions with regard to Pemcor were, however, discussed at least once. Although the testimony is in sharp dispute, the court finds that at some point on either July 20th or 21st, Marvin Temple asked Milt Shapiro whether Maremont was going to make a tender offer, and Shapiro answered "No." (Temple Tr. 907–08; Fuchs Tr. 1105). Although both Temple and Fuchs recalled this question and response in the presence of others, neither Herbert Rowe nor most of the Maremont representatives, including Shapiro, remembered any discussion about a tender offer at the meetings. Jack Mills remembered Temple asking him *when* and not whether Maremont would make a tender offer, and that he (Mills) made no reply. (Tr. 635). Mills remembered this question occurring only when all the documents had been signed at the bank; Temple, however, was not present at that time, so at the very least Mills misremembered the timing of the question.

### The FTC Decree and the Antitrust Representations

At all times relevant to this litigation, Maremont was subject to the terms of an FTC consent order which prohibited Maremont from acquiring the whole or any part of the stock of any company "engaged in the manufacture or remanufacture or the wholesale distribution of automotive replacement parts, accessories, or equipment" without prior FTC approval. This decree was entered pursuant to an administrative complaint filed against Maremont under the Clayton Act. The decree was a matter of public record, and is described in Maremont's 1976 Annual Report. (Ex. 112 at 23).

When Maremont president Richard Black first learned of the Rowe shares, he directed Joe B. Freeman (Maremont Executive V–P) and John Mills (General Counsel) to inquire whether the order would bar acquisition of Pemcor stock. Since Pemcor was in the business of manufacturing car stereo speakers, the issue was whether such speakers fell within the definition of "automotive replacement parts, accessories, or equipment" as defined in the decree.

Freeman's investigation of the matter consisted of asking Jean Allard, an attorney with the Sonnenschein law firm in Chicago and a Maremont director, whether the order applied to a company which manufactured hi-fi components used in original equipment installation of automobiles. Freeman said he did not know the degree to which the company sold replacement equipment. (Allard Dep. 19). Allard informed him that there would be no problem if the company (which was Pemcor) in fact sold only for original installation. (*Id.* at 21). After checking with Sonnenschein partner Earl Pollock, who had been involved in the FTC proceedings, she asked Freeman for further information. (*Id.* at 26). Freeman sent her the Pemcor annual report, some SEC filings, and other financial information, none of which indicated to her that Pemcor was involved in the automotive replacement market. (*Id.* at 32). In fact, the Jensen automotive speaker manufactured by Pemcor is sold as an accessory in the aftermarket for installation in automobiles (as opposed to the original equipment market). (Stipulation ¶ 1).

Based on her understanding that Pemcor sold only to original equipment installers, Allard advised that prior FTC approval was not required. She did, however, caution that Maremont could expect a "challenge" from the FTC. This information was conveyed to Black and Williams in a memorandum dated July 18, 1977. (Ex. 24).

Mills began his investigation by obtaining information about Pemcor from Williams, and called Earl Pollock, who told Mills that his initial reaction was that the decree would not apply. Pollock also advised, however, that he hadn't examined the question enough to issue a written opinion. (Mills Tr. 594). No outside lawyer ever advised Maremont that the FTC decree would bar the transaction with the Rowes. (Mills Tr. 633). The issue remained open in Mills' mind, however, so much so that he asked Herbert Rowe at the July 20th meeting several questions about Pemcor's distribution system. He did not inform Rowe of his concern behind the questions. (*Id.* at 611–612).

The FTC decree was never discussed at the meetings between Maremont and Rowe representatives. The initial draft of the investment representations prepared by Fuchs contained a clause in which Maremont would "warrant and represent that we are not in competition with Pemcor." Edwin Goldberger, an attorney with D'Ancona & Flaum whom Fuchs had contacted, had recommended to Fuchs that this language be modified to incorporate Clayton Act language dealing with vertical integration instead. (Fuchs Tr. 1101, Goldberger Tr. 1374–76). Prior to Pirie's arrival, Mills had agreed to include the original language but not the Clayton Act language. (Fuchs Tr. 1101–02).

After Pirie arrived, he objected to including this language because he said everyone is in competition for the consumer dollar. Pirie had been informed by Freeman of the FTC order's existence upon his arrival in Chicago but had also been told that outside counsel had advised that it wouldn't apply. (Pirie Dep. 50–51). Pirie testified that he was of the impression that Sonnenschein had signed off on an opinion (*id.* at 53) and considered the FTC decree a non-problem. (*Id.* at 98). He further testified that had he thought otherwise, he would not have let Maremont spend its money on the stock. (*Id.* at 134).

When Pirie objected to the no competition representation, Fuchs asked whether there were any antitrust problems. (Fuchs Tr. 1106; Mills Tr. 610; Temple Tr. 906–07). Pirie answered that he knew of none. (Mills Tr. 610; Temple Tr. 906–07; Fuchs Tr. 1106; Pirie Dep. 50–52, 57, 139–41).

Mills testified that he thought of the FTC order at this time but said nothing. (Tr. 610–11). Based on Pirie's representation, Fuchs agreed to drop the antitrust language from the agreement, and the final draft was silent on the antitrust problems.

After the Rowe negotiations had concluded, Mills inquired of Bill Pelster, an attorney with Skadden, Arps, as to whether the order applied. Pelster, after looking into the matter, advised that the FTC decree would not bar the transaction for a reason somewhat different than that relied on by Allard: namely, that the term "automotive replacement parts" as used in the decree was defined in accordance with the Department of Commerce's standard industry classifications, and that Pemcor's stereo speakers fell under a different classification number. (Pelster Dep. 22, 25; Ex. 41).

### The Final Agreement

At the close of the afternoon on Thursday, July 21, the Rowes and Maremont had agreed on final forms of the following documents: a Sale Agreement (Ex. 32); an Escrow Agreement (Ex. 31); a supplemental indemnification agreement; irrevocable proxies coupled with an interest (Ex. 35); and stock powers and certificates (Ex. 34A–D). The documents were signed by Maremont and by the Bank as trustee Thursday afternoon; Mr. Rowe then flew home with the documents and the Rowes signed them the next morning. (A. Rowe Tr. 100; H. Rowe Tr. 705). The documents were then delivered by messenger back to Chicago. (Id.)

The final draft of the escrow agreement, pursuant to the negotiations discussed earlier, provided for a two year escrow with a right of withdrawal after six months for Maremont and after eight months for the Rowes. Maremont retained the unilateral right to control distribution of the escrow, and a separate indemnification agreement ensured that the Rowes would be reimbursed for their legal expenses if Maremont exercised its contractual right to take possession of the shares before Pemcor issued its opinion letter.

The final draft of the sales agreement contains, among other things, Maremont's representation that the sale was in compliance with Section 4(1) of the Securities Act of 1933: "[W]e represent and warrant" that "we have not offered or sold the stock within the meaning of the Act," and that "we are acquiring the stock for our own account for investment, with no present intention of dividing our interest with others or for reselling or otherwise disposing of [the shares] ... in connection with, any distribution thereof." (Ex. 32 p.3). Maremont further represented that it had no "present or contemplated agreement, undertaking, arrangement, obligation, indebtedness or commitment providing for or which is likely to compel a disposition of the stock" and that it knew of no present circumstances "likely ... to promote a disposition." (Id.)

### Maremont's Post-Transaction Conduct

After the Rowe contract was signed, Maremont's president immediately phoned Edward Anixter to announce the purchase and suggest a further meeting between the two executives. (Black Dep. 188–190; 288–89; Anixter Tr. 729). Anixter, who was attending Pemcor's annual board meeting at the time, said he would speak again with Black over the weekend. (Black Dep. 187–89). Anixter then reported both the phone call and his prior contacts with Black to the Pemcor board. (Kaufman Dep. 25; Anixter Tr. 730–31). Some directors responded that Maremont was obviously going to make a takeover bid, and they began discussing various defensive postures. (Anixter Tr. 730–31; Kaufman Dep. 155).

On Friday, also just after the deal was closed, Milton Shapiro contacted Continental Bank to arrange for up to $30 million in financing for an acquisition of Pemcor. (Shapiro Dep. 78, 99–102, 263). Shapiro recalled mentioning to Continental that one of the possibilities being contemplated was a cash tender offer, and discussing with Continental a possible conflict of interest since Continental was Pemcor's banker. (Id. at 67, 263). Strom testified at his

deposition that he spent the weekend drafting "anticipatory tender offer documents" back in New York so that Maremont would be ready to go forward quickly if necessary. (Strom Dep. 86–88; Ex. 26). Black testified, however, that he was still hoping for a friendly takeover at this date. (Black Dep. 290–91).

Over the weekend, Anixter continued to meet with other Pemcor directors and officers. (Anixter Tr. 730–33). On Sunday, July 24, he and Black again spoke by phone. (Anixter Tr. 732; Black Dep. 189–90). Anixter said he needed more time. (*Id.*) Black sensed Anixter's coolness, told Jerry Williams of Maremont to retain the Boston Consulting Group for investment advice, and began to consider that a hostile tender was the most likely course. (Black Dep. 190–91, 290).

On Monday, July 25, the Maremont board held its regularly scheduled annual meeting. (Black Dep. 293). Black took up the subject of Pemcor, and both Williams and Pirie made presentations regarding the purchase and Maremont's alternatives, such as holding the investment, increasing the holding to 20% for accounting purposes, making a friendly merger proposal, or launching a cash tender offer. (Black Dep. 145–46; 294–97; Williams Dep. 165; Pirie Dep. 174–75, 180; Trial Exhibits 43–44). The board approved and ratified the Rowe purchases, appointed a special committee to undertake further investigation of matters regarding Pemcor, and empowered the committee to make additional purchases of Pemcor which would increase Maremont's holdings to approximately 20%. (Ex. 44 at pp. 5–6; Black Dep. 307–308; Pirie Dep. 180).

Also on that Monday, Milton Shapiro contacted bankers at Crocker Bank and Chase Manhattan about financing the tender offer in view of Continental's conflict. (Shapiro Dep. 93–95, 104). Continental eventually decided they could not finance Maremont's hostile offer (*id.* at 91), and Crocker agreed to finance the takeover attempt. (*Id.* at 110).

By Friday, July 29, the Maremont board had given the go ahead for a tender offer, and Black sent Anixter a "bear hug" letter advising of Maremont's intent to make a cash tender offer for any and all Pemcor shares at $16.75 per share. (Ex. 46). Anixter thought Maremont's tender offer price to be "grossly inadequate" (Tr. 738) and knew that the Pemcor directors, who owned significant blocks of stock, preferred remaining independent. The Pemcor board did not respond to the bear hug letter. On Monday, August 1, 1977, Maremont publicly announced its intention to make a tender offer and filed a Schedule 13–D statement in which it announced this plan, and noted that although no definitive plans had been made at the time of the Rowe purchase, the purchase had been executed "with the intention that discussions for … exploring the possibility of acquiring control would be sought." (Ex. 47; Ex. 54 at p.3).

Pemcor, which had by this time discovered the existence of the FTC consent decree, vigorously opposed the tender offer. Pemcor notified the FTC of the acquisition, and the FTC on August 2, 1977 directed Maremont to explain why the purchase did not constitute a violation of the 1971 order. (Ex. 61). On August 3, 1977, Pemcor filed the instant litigation against both the Rowes and Maremont to restrain the Rowes from transferring possession of the shares and raising the consent decree as an issue.

### The Rowes' Post-Transaction Conduct

Immediately upon the closing of the Rowe purchase on July 22, Robert Fuchs phoned Chuck Kaufman, outside counsel for Pemcor and a member of its board of directors, to inform him of the deal and request his cooperation in connection with the opinion letter. (Kaufman Dep. 21–22; Fuchs Tr. 1119–20). Kaufman asked Fuchs whether there would be a tender offer, and Fuchs said that he had been advised there would not be. (Kaufman Dep. 66; Fuchs Tr. 1120).

The next week, on July 29, Kaufman phoned Fuchs to advise him of the FTC decree. (Fuchs Tr. 1121). Fuchs promptly phoned Shapiro and Mills to ask why he hadn't been informed about the order. (*Id.* at 1122–23). Both men assured him that the FTC decree did not apply to the transaction, and that Pemcor was grasping at straws. (*Id.*) Two days later, in response to a request from Kaufman, Fuchs certified on behalf of the Rowes that "the letter agreement, the escrow instructions, the letter agreement with The Illinois Company, the indemnification letter, and the irrevocable proxy are the only agreements, instruments and understandings between our clients, Maremont and/or with any other parties relating to the Stock." The letter also requested that Pemcor promptly issue its opinion letter allowing the escrow to be terminated. (Ex. 57).

Fuchs and the Rowes all first learned of the Maremont tender offer from an article in the August 2, 1977, Wall Street Journal. (Fuchs Tr. 1129; A. Rowe Tr. 176–77; H. Rowe Tr. 796, 803–804). The Rowes told Fuchs that they wanted their stock back, and Gordon Martin of Continental phoned Fuchs to complain that they'd been "taken." (A. Rowe T. 102–05; Martin Tr. 437–39; H. Rowe Tr. 795–800). Fuchs, however, wanted to proceed cautiously, in part because the Rowes were in California, and in part because he felt they had "moved too quickly on the first deal" and should therefore be sure of their position before taking on an adversary relationship with Maremont. (Fuchs Tr. 1131–32). He sought further counsel from the firm of D'Ancona & Pflaum, which now represents the Rowes in this litigation; however, two of the lawyers from whom he sought advice were out of town.

On August 4, Fuchs wrote to Maremont asking for their response to the matters raised in Pemcor's complaint with respect to the FTC consent order. The letter reads as follows:

As you know, neither this firm nor any of the prospective sellers of the shares covered by the July 21st letter agreement between our clients and you was informed either by you or by your counsel of the existence of this consent order and the potential problems it may have created. If, in fact, the effect of the order is to prohibit you from acquiring the Pemcor shares covered by the July 21st agreement, you can well appreciate that there may be some serious legal problems involved.

(Ex. 60). Nothing in the letter refers to the tender offer, the representation about the lack of antitrust problems, the 20% representation, nor any desire to rescind the sale.

On August 12, Fuchs and Temple met with Erwin Goldberger, the securities lawyer who had given them some previous advice on the antitrust matter. The decision was then made to file a crossclaim against Maremont seeking rescission and a counterclaim against Pemcor (in the alternative) on the ground that Pemcor's refusal to issue the opinion letter was "spurious" and without basis. (Goldberger Tr. 1329–32).

On August 15, Fuchs spoke with Pirie by phone; the latter offered to reimburse the Rowes for legal fees in the pending litigation. According to Fuchs' penciled note of the conversation, Fuchs asked Pirie why he hadn't informed them of the FTC order, and Pirie responded "We felt we had no obligation to disclose." (Ex. 137–A at p.10). According to Fuchs' trial testimony, however, Fuchs also told Pirie he thought it incredible that Pirie did not disclose the fact that Maremont was obviously going to go for a tender offer, and expressed his view that the Rowes could rescind the sale. (Tr. 1130–31).

Also on August 15, 1977, the Rowes filed with the SEC a Schedule 13–D in which they listed under the heading "contracts, arrangements or understanding" only the written agreements dated July 21, 1977. (Ex. 124, Item 6). No mention was made of the representations of which the Rowes now complain, nor of any intent to rescind. At or about this time, Mr. Rowe reviewed and signed the Schedule 13–D and also

reviewed Fuchs' August 4th letter to Maremont in which Fuchs complained about Maremont's concealment of the FTC order but was silent on the tender offer. (H. Rowe Tr. 807–808; 825–29). Rowe felt that the August 4th letter was "worded too graciously" but had no complaint as to substance. (*Id.* at 828.) When the Rowes returned home on August 18th, they found a letter from Fuchs dated August 3, with enclosed copies of an agreement to pay the Illinois Company its ⅛ point commission. (Ex. 101; H. Rowe Tr. 804–07). The Rowes signed the agreement.

By letter dated August 23, 1977, Fuchs on behalf of the Rowes formally requested rescission of the sale. In the letter, Fuchs specifically charges that Maremont and its agents violated Section 10(b) of the Exchange Act by, among other things,

stating to the Rowes and to the Muter Trust that your purpose in acquiring their stock was solely for investment and that you planned only to obtain a number of shares of Pemcor stock (approximately 20% of the total outstanding shares) sufficient to cause the election to Pemcor's Board of Directors of one person to be designated by you when, in fact, you intended, while concealing from the Rowes and the Muter Trust that intention, immediately upon purchasing or entering into an agreement to purchase their Pemcor stock at $13.00 per share, to announce a tender offer for all of the outstanding shares of Pemcor stock at a cash price per share substantially in excess of that which you had paid or agreed to pay to them. You and your agents also advised the Rowes individually and as co-trustees of the Muter Trust that your reason for making the investment at that time was that, because Maremont had just sold off one of its divisions, you had ready cash available to purchase such a 20% interest when, in fact, you intended, while concealing from them that intention, to borrow all or substantially all of the funds to purchase their shares. In addition, you and your agents and attorneys omitted to disclose to the Rowes and the Muter Trust the

existence of the FTC Consent Order referred to in Pemcor's complaint in the above action when, in fact, you had represented to them that you were bound by no obligation likely to compel a disposition by you of the Pemcor stock you were purchasing from them, and that you were not aware of any circumstances then in existence which were likely in the future to compel a disposition of that stock.

(Ex. 62 p.2).

Despite the above request, the Rowes on August 30 filed their counterclaim against Pemcor, in which part of the relief requested was an order directing Pemcor to transfer the Rowe shares to Maremont. The cross-claim against Maremont was filed on October 27, 1977 and, like the rescission letter, did not mention either the no tender offer representation or the no antitrust problem representation.

### *Final Disposition of the Stock*

Because of the pending litigation and FTC proceedings, Maremont did not take possession of the Rowe shares during this period and did not go ahead with its tender offer. Both Pemcor and Maremont submitted a series of memoranda to the FTC on the issue whether the 1971 consent decree required FTC approval prior to the sale of the stock from the Rowes to Maremont. The FTC conducted no hearings nor took any evidence. On April 12, 1978, the FTC issued a one-page ruling in which it stated that the FTC order was applicable to Maremont's purchase of Pemcor stock, but then approved the proposed acquisition without discussion. (Ex. 63). On April 18, 1978, over the Rowes' objections, Continental Bank as escrow agent delivered the Rowe shares to Maremont, and credited the respective accounts of the Rowes and the Trust with a total of $2,982,605.29. (Stipulation, ¶ 38).

On the date the escrow was distributed, Pemcor closed at 21⅝, representing a $1,901,115 profit to Maremont. On May 25, 1978 Pemcor transferred the Rowe

shares to Maremont. (Kaufman Dep. at 82–83). On that date, Pemcor closed at 23⅞. Maremont's subsequent attempts to reinitiate merger discussions with Pemcor were rebuffed. On October 18, 1978, Pemcor merged into Esmark, and Maremont exchanged the Rowe shares for a block of Esmark stock which had a market value of $6,993,360. (Trial Exs. 75, 136). These Esmark shares were sold in August, 1979 for the sum of $7,039,439, thus representing a total gain to Maremont of $4,056,834 on its purchase of the Rowe block. (*Id.*) It is undisputed that after the Rowes received the payment from the escrow, they made no attempt to purchase any Pemcor stock. (A. Rowe Tr. 219).

## LEGAL DISCUSSION

■ In order to recover damages, a plaintiff in a 10b–5 action must prove by a preponderance of the evidence the following elements: 1) a material misrepresentation or omission, 2) made with intent to deceive, 3) which proximately caused the plaintiff's injury. *McNichols v. Loeb Rhoades & Co.*, 97 F.R.D. 331, 336 (N.D.Ill. 1982). Plaintiffs argue that Maremont violated Rule 10b–5 in the following ways:

1) By not disclosing its intent to pursue a control acquisition of Pemcor when it represented that it was purchasing the shares for "investment" and that its goal was only to acquire up to 20%, or enough shares to elect a director;

2) By not disclosing the FTC order despite representations that it knew of no antitrust problems and that it knew of no circumstances likely to compel a disposition of the stock;

3) By falsely denying any intent to make a tender offer when asked.

Maremont, in turn, argues that its agents never represented it would not acquire above 20% and that it would not make a tender offer, and that its agents were under no duty to disclose the FTC order or the company's future intentions. Maremont further argues that the alleged statements were not material, and that the Rowes have failed to prove reliance, scien-

ter and damages. Before turning to the merits of these arguments as to each claim, the court will briefly address four underlying legal disputes raised in the briefs: 1) Maremont's duty to disclose; 2) plaintiff's duty to prove reliance; 3) whether reliance on nonwritten representations in this context is reasonable as a matter of law; and 4) materiality of preliminary merger discussions.

### 1. *Duty of Disclosure.*

The wrongs of which plaintiffs accuse Maremont primarily involve matters of omission. The parties have briefed and disagree on the issue of whether and to what extent Maremont was under an affirmative duty to disclose information. Plaintiffs argue that under Rule 10b–5, "when a party undertakes to disclose anything, it has the duty to speak the full truth." *Issen v. GSC Enterprises, Inc.*, 538 F.Supp. 745, 751 (N.D.Ill.1982). Maremont, on the other hand, contends that omissions are only actionable under 10b–5 where the defendant is an insider with respect to the stock being traded or is a fiduciary of the plaintiff, *Chiarella v. United States*, 445 U.S. 222, 229–30, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980), and points out that the cases relied on by plaintiffs involve corporate insiders subject to affirmative duties of disclosure. *See, e.g., Issen* at 751. Plaintiffs argue in reply that *Chiarella*'s import is confined to open market transactions, not face-to-face negotiations, and that Maremont was therefore under a duty to disclose the "full truth" about its intentions.

■ The court disagrees with the latter statement. Under traditional principles of common law fraud, which typically inform the liability rules for 10b–5, suppression of facts is not actionable absent an affirmative duty to disclose, and plaintiffs have offered no authority for the proposition that the obligations automatically differ between open market and face-to-face purchases. Thus, to the extent that plaintiffs seek recovery on the assumption that Maremont was legally obligated to disclose

all material information, their claim fails as a matter of law.

Nonetheless, this court does not view *Chiarella*'s language about relationship of "trust and confidence" as suggesting the sole way in which a duty to disclose under Rule 10b–5 might arise. At common law, a party who is under no obligation to speak as to a matter, if he undertakes to do so, is bound "not only to state the truth but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure." *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1313 (5th Cir.1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). Such a rule is explicit in the language of Rule 10b–5 itself, which makes it unlawful "to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...."

Numerous courts have followed *Bankshares* to hold that a party who makes a materially incomplete disclosure thereby triggers a duty under Rule 10b–5 to disclose whatever additional information is necessary to prevent the earlier statement from being misleading. *See Levinson v. Basic, Inc.*, 786 F.2d 741, 746–47 (6th Cir. 1986); *Grossman v. Waste Management, Inc.*, 589 F.Supp. 395, 409 (N.D.Ill.1984); *Rose v. Arkansas Valley Environmental & Utility Authority*, 562 F.Supp. 1180, 1207–08 (W.D.Mo.1983); *Marrero v. Banco DiRoma*, 487 F.Supp. 568, 575 (E.D.La. 1980); *Upton v. Trinidad Petroleum Corp.*, 468 F.Supp. 330, 337 (N.D.Ala.1979), *aff'd* 652 F.2d 424 (5th Cir.1981). At least one of these cases has further held that *Chiarella*'s language about "trust and confidence" does not change the above rule. *Rose*, 562 F.Supp. at 1207. This court agrees. Thus, while Maremont was under no general obligation of disclosure, the Rowes may argue Maremont's omissions in connection with statements they allege are misleading because materially incomplete.

### 2. *Reliance.*

A legal question closely related to the above is whether the Rowes are under an affirmative duty of proving reliance in order to recover damages. Generally, plaintiffs bringing suit under Rule 10b–5 must prove reliance as an element of their claim. In "pure omission" cases, however, reliance and causation are presumed once materiality of the omitted statements is proven. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). Plaintiffs therefore argue that with respect to facts that were not disclosed they are under no burden of proving reliance in this case.

Plaintiffs are wrong. As discussed at length by my colleague Prentice Marshall in *Grossman v. Waste Management, Inc.*, 589 F.Supp 395 (N.D.Ill.1984), the *Affiliated Ute* presumption of reliance "exists primarily because of the practical impossibility of proving reliance where no statements are made," and therefore its "underlying rationale does not logically apply in a case in which the 'omissions' are the type that can be said to exist only because of other, positive statements that the [defendant] has made." *Id.* at 409, citing *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 716–17 (8th Cir.1978). Thus, when alleged omissions are really "in the nature of misrepresentations (misleading statements, half-truths)," reliance must be proven. *Vervaecke*, 578 F.2d at 717 n. 2. *Accord, Wilson v. Comtech Communications Corp.*, 648 F.2d 88, 93–94 (2d Cir. 1981); *Lorber v. Beebe*, 407 F.Supp. 279, 289 (S.D.N.Y.1975).

The implications of this case authority for the present lawsuit are as follows. Maremont was under no obligation to disclose the possibility of a tender offer or the existence of the FTC consent decree absent statements which would be materially misleading without the disclosure of that additional information. In consequence, plaintiffs must prove reliance on the allegedly misleading statements—namely, that Maremont was purchasing only "up to" 20% of

Pemcor, that it knew of no "antitrust problems," and that it would make no tender offer—before damages can be awarded on an omission theory.

### 3. *Reliance on Nonwritten Representations.*

The third area of legal dispute between the parties centers on the application of the materiality rule to fully negotiated transactions such as the present one. At several portions of its post-trial brief, Maremont argues that the alleged misrepresentations were not material or that the Rowes could not have reasonably relied on them, because none of the misrepresentations were contained in the final written agreement, and because the Rowes through their attorney Fuchs certified to Pemcor that the written agreements were "the only agreements, instruments and understandings" between themselves and Maremont. (Ex. 57 p. 2).

In *Contractor Utility Sales Co. v. Certain-Teed Products Corp.,* 638 F.2d 1061 (7th Cir.1981), plaintiff sales agent and defendant manufacturer engaged in two days of face-to-face negotiations during which defendant orally promised to keep plaintiff "competitive" in the rural water market. *Id.* at 1068. The final written sales agent agreement, however, did not contain this representation and did contain an integration clause. The Seventh Circuit rejected the position that as "a matter of law, it is unreasonable for any party to rely upon a prior oral representation when that party subsequently executes a negotiated written contract containing different representations and an integration clause disavowing any prior representation not incorporated in the written agreement" and held that the "reasonableness of [the plaintiff's] reliance is best decided by the jury which can weigh the various relevant factors such as: the prior relations of the parties, the frequency and nature of the representations, the conflict between the representations and the contract provisions, and the custom within the trade." *Id.* at 1083.

Certainly in many cases consideration of these factors would preclude reliance as a matter of law. In *Robinson v. Cupples Container Co.,* 513 F.2d 1274, 1277 (9th Cir.1975), plaintiff claimed that the defendant purchaser of his business falsely promised to invest significant sums in expansion of his old company's operation. Plaintiff admitted, however, that when the agreement was drafted months later, the company refused his request to put this representation in the written agreement. The trial court directed a verdict in the defendant's favor. The court of appeals found that no reasonable investor would have attached importance to the earlier representation under the circumstances of the later refusal, and affirmed.

■ In the present case, the letter agreement between Maremont and the Rowes contains no integration clause, nor any representation which contradicts the alleged misrepresentations based on which the Rowes now seek relief. Under these circumstances, even though both sides were represented by counsel, reliance remains an issue for the finder of fact. To the extent that Maremont argues reliance is vitiated as a matter of law, its argument is rejected. The Rowes' later certification that there were no private understandings between them and Maremont, and the Rowes' failure to insist on reducing the alleged misrepresentations to writing are, of course, nonetheless relevant in determining whether reliance and materiality have been proven.

### 4. *Materiality of Preliminary Merger Discussions.*

Maremont finally argues that as a matter of law, the Rowes' claims are insufficient to the extent that the Rowes seek relief for Maremont's failure to disclose the possibility of a tender offer. Maremont correctly argues, that for purposes of a pure nondisclosure case, a proposed merger transaction only becomes material once it has passed beyond the preliminary stage. *See Greenfield v. Heublein, Inc.,* 742 F.2d 751 (3d Cir.1984), *cert. denied,* 469 U.S.

1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985); *Reiss v. Pan American World Airways, Inc.*, 711 F.2d 11 (2d Cir.1983); *Staffin v. Greenberg*, 672 F.2d 1196 (3d Cir.1982); *S.E.C. v. Mize*, 615 F.2d 1046 (5th Cir.), *cert. denied*, 449 U.S. 901, 101 S.Ct. 271, 66 L.Ed.2d 131 (1980). As noted by the Seventh Circuit in *Michaels v. Michaels*, 767 F.2d 1185, 1195–96 (7th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986), the policy underlying this rule is not that merger negotiations are unimportant to investors but that until price and structure are agreed upon the disclosure of a tentative merger is likely to mislead the market. The rule is limited by its rationale to cases when there is a public market for the target's stock. *Id.* at 1196.

■ The facts are undisputed that Maremont still had not decided to make a tender offer for Pemcor as of the date of the Rowe transaction, and the above cases are therefore applicable. Nonetheless, the rule entitling an issuer to keep silent about preliminary merger negotiations does not logically extend to the situation where a duty to disclose arises from other affirmative misstatements of a party or its agents. *Levinson v. Basic, Inc.*, 786 F.2d at 748–49; *Etshokin v. Texasgulf, Inc.*, 612 F.Supp. 1212, 1217 (N.D.Ill.1984). In the latter situation, the true gravamen of the injury is not nondisclosure but that the half-truth uttered was misleading under the circumstances. Thus, even though Maremont was under no duty to reveal its intentions regarding Pemcor, that privilege did not entitle Maremont's agents to make other affirmative statements about its intent which would tend to imply that no tender offer was being considered. As noted in *Levinson*, once the defendant made certain statements regarding the existence of merger discussions, "it assumed the legal duty to be truthful." 786 F.2d at 747. Moreover, because the possibility of a tender offer has a significant impact on a stock's value, affirmative misstatements regarding such a tender are material under the test of *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). *See Levinson*, 786 F.2d at 748.

With these overall legal standards in mind, the court turns to the specific claims of the plaintiffs.

### *Misrepresentations and Omissions Re Possible Tender Offer*

■ All the Rowe witnesses testified that Maremont never revealed to the Rowes that it wanted the Rowe block as a springboard in a tender offer or other control acquisition. The only evidence suggesting otherwise was Pirie's deposition testimony that he thought he made it clear that Maremont was preserving all future options (Pirie Dep. 106, 205), and a page from Fuchs' memorandum indicating that Pirie specifically said that Maremont had made "no decisions" and wanted to retain "maximum flexibility." (Trial Ex. 137–A p. 5). Neither Pirie nor anyone else from Maremont remembered specific remarks, however, and the statement regarding flexibility was apparently made in the context of discussing Maremont's possible desire to take the shares out of escrow before Pemcor issued an opinion letter. (*Id.;* Pirie Dep. 206). The court finds this evidence vague at best, and insufficient to outweigh the live, credible, consistent and contrary testimony of the Rowe witnesses. The court then addresses whether Maremont knowingly implied that no tender would occur so as to incur a duty of disclosure.

By far the most crucial of the representations is Maremont Treasurer Shapiro's negative response when asked by Temple whether Maremont was going to make a tender offer. Although this statement was made after the Rowes had committed to a $13 price, the statement was made while the documents were being negotiated and drafted. The evidence strongly suggests that Shapiro was informed about Maremont's possible course of action, and thus knew or must have known that his negative answer was misleading. The evidence is in sharp dispute, however, as to whether the statement was ever made, and, if made, whether it was relied upon. In particular,

defendant contests the accuracy of Fuchs' and Temple's recollection since the exchange is nowhere mentioned in the August rescission letter nor the Rowes' cross-claim, was not mentioned in Fuchs' very detailed notes of the negotiations, and was not testified to by Fuchs at his deposition. Prior to trial, only Temple recalled the exchange and answer.

Despite the improbability that such a statement, once made, could have been ignored by Fuchs, the court found both Temple and Fuchs to be highly credible witnesses, and was never given the opportunity to gauge the credibility of the Maremont agents who were present at the transaction. Temple testified that not only was the statement made but that he reminded Fuchs about it shortly after the tender had been publicly announced. (Temple Tr. 929–33, 941–42). Fuchs corroborated the conversation, to his own embarrassment since it meant admitting that he forgot a crucial detail in the preparatory stages of this litigation. Given the consistency and credibility of their testimony, the court finds it altogether improbable that both attorneys could have misremembered the exchange. Thus, only three conclusions are possible: either Fuchs and Temple are *both* lying; Fuchs lied to corroborate Temple, who simply misremembered; or the exchange occurred more or less along the lines testified to by Temple and Fuchs simply forgot until he became aware of Temple's deposition testimony. The court finds the latter possibility the most probable of the three.

Nonetheless, the failure to mention the statement in the rescission letter, complaint, or Exhibit 57, raises serious questions of reliance. Fuchs gave no explanation for why he forgot the statement. The most logical explanation, however, is that he and the Rowes considered the statement unremarkable in that Maremont had already affirmatively represented that its intentions were only to purchase around twenty percent of Pemcor or whatever interest it took to elect a director to the board. The Rowes' concentration on the former statement is explained by the fact that neither of them knew about Temple's

question, and Fuchs' concentration on the former may be chalked up to poor judgment.

While this explanation contradicts somewhat Fuchs' characterization of Shapiro's statement as "dramatic," the latter testimony is attributable to Fuchs' excitable way of narrating events. It is apparent to the court that the question and answer must have occurred in a side exchange, based on the fact that no other witnesses present, including Mr. Rowe, remembered it. (The court found credible Pirie's deposition testimony that he never heard this remark and never would have allowed it to be said without qualification.)

The evidence also shows beyond dispute that Teach told Mrs. Rowe that Maremont was purchasing the Rowe shares for investment, and that it wanted only enough shares to elect a director, which in turn meant around 20%. This testimony was not only consistent but was corroborated by the contemporaneous memoranda of the meeting prepared by Darryl Hoovel (Ex. 25) and by Fuchs. (Ex. 137–A). The court also finds without much dispute that the plaintiffs genuinely interpreted Teach's remarks to indicate that Maremont's *sole* intention was to acquire an investment of around 20%. The court is particularly impressed by the facts that two bank officers with no financial interest in this case so interpreted Teach's remark, and that one of those officers immediately phoned Fuchs upon learning of the tender to complain that they'd been "taken." (Martin Tr. 439).

Whether the above statements were made with the intent to mislead is a more complicated question. In order to collect damages, the Rowes must prove that Maremont acted with *scienter*, i.e., either with the intent to deceive or with awareness that its statements created a danger of misleading others. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). Reckless conduct is actionable under 10b–5 where it is equivalent to "wilful" fraud. *Id.*

This standard requires a statement-by-statement assessment on these facts, since at least some of the statements regarding "investment" purpose were made in the context of the "investment representations" required to satisfy the private placement exemption, i.e., that Maremont was not purchasing with a view to resale. Certainly, this is the meaning of the "investment representations" contained in the final agreement, and the court found plaintiffs' arguments to the contrary unpersuasive. Even if plaintiffs did so interpret the written agreement, the court finds that Maremont did not intend to represent anything about a tender offer through these statements.

The evidence also shows, however, that both Teach and Shapiro on separate occasions during the negotiations referred to "investment" as Maremont's motive in purchasing Pemcor stock, and not merely as an assurance that the sale was in compliance with federal securities law. *See, e.g.,* Trial Ex. 137–A at p. 4 (Shapiro said he thought Pemcor was a "good investment"). Had Maremont been under an obligation to disclose control intentions, such statements would not have fairly alerted plaintiffs to the possibility of a merger or tender. *See Gearhart Industries, Inc. v. Smith International,* 741 F.2d 707, 713 (5th Cir.1984). In this case, however, Maremont was only under such a duty if its statements tended to imply that no tender would take place.

This court need not decide whether the mere invocation of vague investment motives thereby typically triggers a duty to disclose all intentions regarding merger. In this case, several of the statements regarding investment purpose were made in conjunction with a statement about electing a director to the Pemcor board, which appears to be without factual basis, and a statement, with only limited factual basis, that Maremont would purchase "up to" the percentage necessary for electing a director. The latter statement was not only made by Teach, but repeated by Penner and/or Shapiro when Temple was present. Both the repetition and the lack of factual basis bolster the plaintiffs' claim that the

statement was intended as a smokescreen behind which Maremont could hide its true intentions. Significantly, no witness from Maremont ever testified to give an innocent explanation of either remark. Maremont's failure to produce its own employees as witnesses raises an inference that their testimony would not have been favorable to Maremont. *P.R. Mallory & Co. v. NLRB,* 400 F.2d 956, 959 (7th Cir.1968), *cert. denied,* 394 U.S. 918, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969).

The court is further struck by certain collateral misrepresentations which make sense only if one accepts plaintiffs' theory of events. First, both Teach and Shapiro represented Maremont's recent sale of a division and consequent cash on hand as reasons for the investment when these events were irrelevant to Maremont's interest in Pemcor. Second, Shapiro said that the Skadden, Arps lawyers were just "stopping by" as if to minimize the significance of Maremont not being represented by its usual attorneys, the Sonnenschein firm in Chicago. Third, Shapiro said that the cash would be wired in from California upon closing of the deal, in support of the story that sale proceeds were being reinvested, whereas Maremont in fact used its revolving credit from Continental to finance the purchase. The statements, although immaterial, persuade me that the statements regarding election of a director more likely than not were made as part of Maremont's attempt not only to keep silent about a possible tender but to create an impression of limited intentions and thus prevent the subject from ever arising.

Finally, although again the evidence is susceptible of a different conclusion, the court finds that the plaintiffs have proven reliance and materiality. Mrs. Rowe refused to sell the stock "blind" without knowing Maremont's identity and something about its motives. The plaintiffs all genuinely believed Maremont was not going to make a control bid for Pemcor but simply hold a limited investment: again the court is struck by the banker Martin's testimony in particular. Hoovel, Martin, Fuchs,

and Temple all further testified that they would have attempted to negotiate for some control premium had they considered a tender offer to be a possibility. (*See, e.g.,* Martin Tr. 439–40). While the statements regarding 20% and electing a director arguably were immaterial in and of themselves, they were made in direct response to Mrs. Rowe's questions and were misleading because they failed to include the material factor that 20% was merely a "fallback" position and that Maremont's true goal was to merge with or acquire Pemcor.

Maremont argues that the Rowes were in fact unconcerned about what Maremont might do in the future with the Rowe block, and the written agreement's silence on the subject supports Maremont's argument. The Rowes' lack of concern, however, was predicated on their impression that Maremont had only limited intentions at the time of the purchase. The Rowes could have reasonably relied on this statement and considered it material without wanting to prevent Maremont from changing its mind in the future. What is important is that Mrs. Rowe questioned Teach about Maremont's intentions before agreeing to the sale or the $13 price. Thus, while it is unusual in a transaction of this kind not to include all material representations in writing, the Rowes' failure to put such matters into writing does not bar their recovery.

The court is admittedly troubled by the facts that Fuchs did not object after the tender offer was first announced but instead went forward with the deal, and that his notes of the August 15th conversation with Pirie reflect discussion of only the FTC problem. Martin, however, testified that he objected immediately and the Rowes themselves testified that they wanted rescission right away but then consented to Fuchs' instruction to be cautious. The plaintiffs formally requested rescission about three weeks later, which is not an excessive period under most circumstances. The three-week delay in demanding rescission was primarily caused by the Rowes being in California and by attorneys from the D'Ancona & Pflaum firm being on va-

cation. That Fuchs may have misjudged the situation in advising excess caution and purporting to go forward in the interim, does not to the court's mind provide grounds for denying plaintiffs damages altogether.

Two other items could be seen as disproving reliance, and therefore merit brief discussions. First is Mills' testimony that at some point of the negotiations Temple asked him when (and not whether) Maremont was going to make a tender offer. The court found Mills a highly credible witness in that he freely admitted to thinking about the FTC order at the time Pirie represented a lack of antitrust problems. However, his testimony regarding this statement is questionable in that it did not come up at Mills' deposition and Mills remembered the question being asked at a time and place when Temple could not possibly have been there. Obviously, Temple could not both have asked the above question *and* have relied on the 20% statements as indicating an intent not to seek control. For this court to accept Mills's testimony would require finding that Temple lied on the stand. Based on all the evidence and the demeanor of the witnesses, I find it more likely that Mills either misheard or misremembered the question than that Temple could have lied.

■ Second is Anixter's testimony that he told Herbert Rowe on the 21st of July that Rowe's purchaser was probably planning a takeover, to which Rowe didn't reply. Rowe himself remembered responding that he had been advised there would only be a twenty percent purchase. Even accepting Anixter's version of events as more likely, however, Anixter's statement in and of itself would not necessarily give Rowe a reason for disbelieving Maremont's inconsistent representations. (As indicated in Rowe's August 1977 deposition, these representations were not made to him directly but communicated through his wife.) The negligence of a 10b–5 plaintiff cannot bar his claim unless the plaintiff displays gross conduct amounting to a reckless dis-

regard for the truth, such as when a plaintiff relies on certain oral statements despite express written warnings to the contrary. *See Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 529–30 (7th Cir.1985); *Zobrist v. Coal-X, Inc.,* 708 F.2d 1511, 1517 (10th Cir.1983). Mere failure to "nose out" the truth does not defeat recovery.

In this case, the preponderance of the evidence suggests that Maremont never expressly said that a 20% investment was at best a fallback position; the only statements regarding Maremont's retaining flexibility were in connection with the escrow. That Anixter expressed a contrary opinion did not put on Rowe the legal duty to re-inquire of Maremont exactly what its intentions were. Moreover, when Temple did inquire further into the possibility of a tender, he received a negative answer. Therefore, the court finds that Rowe's failure to heed Anixter's warning does not disprove reliance.

Maremont further argues that the Rowes' decision to press forward with their counterclaim contradicts their trial testimony of reliance. The court agrees with plaintiffs that to so hold would effectively and improperly penalize them for exercise of their right to make inconsistent pleadings under Fed.R.Civ.P. 8(e)(2). *See Continental Insurance Co. v. Sherman,* 439 F.2d 1294, 1298 (5th Cir.1971) (holding that one of two inconsistent pleas should not be used as evidence in the trial of the other). The Rowes were in doubt about how the FTC would resolve the dispute between Pemcor and Maremont, understandably sought to preserve their rights whichever way the FTC proceedings were resolved, and apparently relied on counsel in pressing forward with both claims. While the inconsistency here is admittedly unusual in that the Rowes' two claims sought contradictory relief instead of alternative grounds for the same relief, Maremont's argument is unpersuasive.

### Misrepresentations and Omissions Re the FTC Decree

Maremont never made any representations regarding the existence of the FTC decree; the Rowes nonetheless argue in their brief that they requested and were entitled to know of all risks which could cause any delay in distributing the stock and the money. The court has searched the record for testimony that the Rowes expressly asked for such information, however, and has found none. Therefore, Maremont would only have been obliged to disclose the existence of the FTC order if disclosure was necessary to make other representations not materially misleading. Plaintiffs claim that two statements created such a duty: 1) Maremont's written representation in the final agreement that it knew of no circumstances or obligations likely to compel a disposition of the stock; and 2) Pirie's statement that he knew of no antitrust problems.

■ The plaintiffs' arguments on the former statement are without merit. Maremont's statement regarding disposition was made as part of the "investment representations" necessary for ensuring that the stock could be sold without violating the registration requirements of the securities laws. The term "disposition" therefore can only reasonably be construed as referring to a market disposition or divestiture which would violate the 1933 Act. Even if the FTC had ordered Maremont to divest itself of the Pemcor shares, such sale and divestiture would not necessarily have rendered the Section 4(1) exemption from registration unavailable. (*See* Goldberger Tr. 1456). While with hindsight the Rowes obviously considered this statement misleading, the court finds no persuasive evidence that the statement was either intended or relied on at the time of the negotiation in the sense now claimed. Thus, if Maremont acquired a duty to disclose the FTC order's existence, it would only be by virtue of Pirie's statement that there were no antitrust problems involved in the purchase.

■ Pirie's statement was relied on by Fuchs, at least to the extent that Fuchs was willing to drop negotiations for a writ-

ten guarantee on the basis of Pirie's opinion, even though Mills had refused to include a statement that no vertical integration problems existed. The statement was arguably material in that antitrust problems could exacerbate the recognized danger that Pemcor might attempt to delay in issuing the opinion letter, although Fuchs never apparently advised anyone from Maremont that this was his reason for requesting such language in the initial draft, and did not mention Pirie's statement in the rescission letter. Since the FTC order also presented a danger of delay, it too was arguably material. The court notes, however, that the delay eventually caused by the order—8 months—was far less than the initial two-year period the Rowes were willing to accept, and Fuchs did not insist on keeping the representation in writing. Thus the materiality factor was minimal at best.

■ Even assuming that Pirie's statement was materially misleading, however, this particular claim of nondisclosure would have to fail for lack of scienter. Contrary to Teach's and Shapiro's representations regarding Maremont's future intentions, Pirie's statement was not untrue, as the FTC's one paragraph approval of the transaction tends to show. More importantly, however, Pirie based his statement on the advice from the Sonnenschein firm that the decree would not apply. (Pirie Dep. 53). No outside lawyer ever told Maremont that the decree would apply or that Maremont should request prior FTC approval. (Black Dep. 225; Shapiro Dep. 219; Pelster Dep. 21–24, 51–53; Allard Dep. 32–33). In Pirie's words, the FTC decree to his mind was a "non-problem." (Pirie Dep. at 98). Although the Rowes have attempted to infer scienter from what they describe as an inadequate investigation, the evidence does not show that the investigation was in bad faith.

The Rowes concede in their reply that Pirie may have believed his statement, but argue that Mills certainly did not, and therefore that Maremont knowingly violated its duty of disclosure. Mills' excessive concern, however, does not change the fact that he too had been advised by outside counsel that the order wouldn't apply, and apparently relied on that advice in not mentioning the FTC order to the Rowes. The court has had the opportunity to see Mr. Mills in person, found him to be a credible witness, and concludes that his silence on the FTC order in the face of Pirie's comment was neither reckless nor willful conduct such as would establish a 10b–5 violation.

### Common Law Fraud

Under Illinois law, a higher standard of proof than preponderance of the evidence is required to prove fraud; the plaintiff must prove all elements of the claim except reliance and injury by "clear and convincing evidence." *Gordon v. Dolin*, 105 Ill. App.3d 319, 324, 61 Ill.Dec. 188, 192, 434 N.E.2d 341, 345 (1st Dist.1982). As should be obvious from the delay in issuing this opinion, I did not find the plaintiffs' proof clear and convincing. There is some basis in the record for finding that Teach may have intended his remarks simply to refer to the ownership percentage which would result should all the Pemcor directors contacted by the Illinois Company decide to sell, and Fuchs' post-transaction conduct raises doubt as to whether Shapiro denied the existence of the tender offer. While I have found otherwise, I did so only after much deliberation.

The court notes, for purposes of appeal, that it would be in any event inclined not to award punitive damages in this case: the evidence of scienter, although sufficient, is thin, and some of the Maremont representatives—Pirie and Strom—assumed that the Rowes were aware of Maremont's true intent. Since the chief effect of upholding the common-law claim would be to allow a punitive award, my decision on the common-law claim is largely without significance.

### Damages

■ Under § 28(a) of the Securities Exchange Act, 15 U.S.C. § 78bb(a), a de-

frauded seller of securities may not recover "a total amount in excess of his actual damages on account of the act complained of." The ordinary measure of such actual damages is out-of-pocket loss, or the difference between the fair value of what the plaintiff received and the fair value of what he would have received had there been no fraudulent conduct. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972). In certain situations, however, it is within the discretion of the court to apply a rescissory measure of damages. *Arrington v. Merrill Lynch, Pierce, Fenner & Smith*, 651 F.2d 615, 621 (9th Cir.1981). The discretion as to which measure of damages is more appropriate in a given case belongs to the district judge. *Id.* at 621.

In *Affiliated Ute*, the Supreme Court indicated that one exception to the out-of-pocket measure arises "where the defendant received more than the seller's actual loss." In such cases, the Court stated, "damages are the amount of the defendant's profit." 406 U.S. at 155, 92 S.Ct. at 1473, citing *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). Because Maremont eventually made a profit on the Pemcor stock vastly in excess of any out-of-pocket loss the plaintiffs could reasonably claim, plaintiffs argue that disgorgement of profits is the proper measure of damages and ask for damages of $4,056,834, the profit realized by Maremont when it sold its Esmark shares in August 1979.

▮ Although the literal language of *Affiliated Ute* encompasses this case, the rescissory measure of damages mentioned in that case "contemplates a return of the injured party to the position he occupied before he was induced by wrongful conduct to enter the transaction." *Nelson v. Serwold*, 576 F.2d 1332, 1339 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978). In other words, disgorgement of profits is appropriate only where the profits are "causally related" to the wrongdoing, *SEC v. MacDonald*, 699

F.2d 47, 54 (1st Cir.1983), and the profits to be recovered must therefore be limited to those accretions which occurred up to a reasonable time after plaintiffs discovered the truth. *Id.* at 53.

Were this court to adopt a disgorgement measure of profits, the reasonable time within which the market accretions could be considered causally related to Maremont's wrongdoing would be no later than the date the escrow was distributed, or April 18, 1978, by which date Maremont had profited by a total of $1,902,115. After that date, the Rowes were free to reinvest their proceeds in Pemcor but chose not to do so. While trial counsel have argued that such reinvestment was impossible given the size of the block, the court finds no testimony that this was the fact or that this consideration was a factor in the plaintiffs' minds back in 1978. Therefore, if a rescissory measure is appropriate, the correct disgorgement award would be $1,902,115.

Maremont, however, argues that disgorgement is inappropriate under the present circumstances since the Rowes were intending as of July 1977 to sell their interest in Pemcor regardless of its future profitability. As noted in *Capital Investments, Inc. v. Bank of Sturgeon Bay*, 430 F.Supp. 534 (E.D.Wis.1977), *aff'd*, 577 F.2d 745 (7th Cir.1978):

> All of the decisions allowing rescisionary damages operate upon a common assumption: that profits, accruing after the sale to the fraudulent purchaser, would have accrued to the defrauded seller but for the fraud, i.e., the seller would have retained the securities.... [W]here it is shown that the seller would not have retained the securities had full disclosure been made, there is no reason to allow the plaintiff accrued profits as damages."

*Id.* at 536. *See also Myzel v. Fields*, 386 F.2d 718, 745 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968) (jury instructed to consider before determining damages whether upon full disclosure plaintiffs would have still sold

but at a higher price or would have retained stock).

It is of course impossible to turn back the clock and determine exactly what the Rowes would have done had Maremont revealed its intention to make a bid for all of Pemcor's stock. The Rowes themselves testified that they wouldn't have consummated the deal due to the controversy involved; the Rowes' lawyers and bankers testified that they would have negotiated for a higher premium on the price. It is evident, however, that the Rowes had unequivocally decided to sell "all or substantially all" of the Pemcor stock before Maremont contacted them, and had preliminarily committed themselves to a secondary offering of their stock. Plans for the offering were not canceled until after the Rowes had reached preliminary agreement with Maremont. Had the deal with Maremont *not* gone through, the most likely conclusion I can draw is that no tender would have been made at that time and the Rowes would have proceeded with the offering, which in turn would have meant selling their shares at a considerable discount from the price received from Maremont. Based on the information in the record, not until June of 1978, after the Rowes had received the escrowed cash and long beyond the time a secondary offering would have required, would the Rowes have received more than $13 per share in a secondary offering.

The Rowes argue that although it is "speculative" what would have happened had they not sold to Maremont, "it is more appropriate to give the defrauded party the benefit of windfalls than to let the fraudulent party keep them." *Janigan v. Taylor,* 344 F.2d 781, 786 (1st Cir.), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). The problem with this argument, however, is that it is not merely speculative what would have happened in this case: the evidence strongly suggests that the Rowes were eager to sell at the time they dealt with Maremont, were following advice of counsel (who would upon disclosure have negotiated for a premium), and thus would not have held onto their Pemcor

stock in any event. Even with hindsight the Rowes made no attempt to purchase any Pemcor stock after they received the escrowed funds. The record also suggests that had the deal with Maremont *not* gone through, there would have been no tender offer and immediate rise in price at that time. Given this evidence, any damage award must be made on the theory not that the Rowes would have kept their stock in the event of full disclosure, but that they would have been able to sell at a price which fully reflected the value of the undisclosed information. The latter measure of damages, and not the profits Maremont subsequently made, most reasonably represents the "proximate consequence of the fraud." *Janigan,* 344 F.2d at 786. This is particularly true here because the subsequent price rise was primarily caused by bidders in the market for Pemcor other than Maremont.

■ According to Maremont, since the plaintiffs' secondary offering would have yielded them less than $13 per share, the Rowes have suffered no damages at all. The court disagrees. The appropriate measure of damages in this case is the traditional out-of-pocket measure of damages: the difference between the price received and the actual value of the stock, with the latter value determined by reference to the market reaction when Maremont publicly announced its tender offer. The court reaches this conclusion with some hesitation, since the parties have neither requested nor addressed such a measure. This court, however, is not limited in its role as a finder of fact by the plaintiffs' specific requests.

According to the record in the court, Maremont's purchase of the Rowe shares was publicly announced the same day that Pemcor announced a substantial improvement in earnings: the stock (which had been inching up the entire period of the Rowe-Maremont negotiations) jumped over one point the next trading day to a high of 16.5. The stock then dropped to around 15, but climbed up again to 16.3 shortly after

Maremont announced its tender offer. The stock price thereafter fluctuated and dropped below 16 until mid-November. Not until November 22, 1977 did the stock price again exceed 16.3.

There was no expert testimony at trial to explain how much of the rise in the market was due to Pemcor's increased performance and how much to Maremont's acts. At one point of the trial, I indicated that in the absence of such testimony I might charge Maremont with the actual market price if it were found guilty of wrongdoing. (Tr. 897). The high in the market after Maremont announced its tender was 16.3; by the market's evaluation of the undisclosed information, the Rowes were thus induced to accept a sale price 3.3 points below the actual value of their stock. This price, ironically enough, is close to (but slightly higher than) the 25% figure Fuchs testified he would have sought as a control premium had he known all material facts. (Fuchs Tr. 1135). There was no evidence to suggest that the Rowe block was worth more as a toehold to Maremont than the rest of the stock, especially since the shares could not be resold on the open market. The court therefore accepts 3.3 as the most appropriate per share measure of damages. Multiplying 3.3 times the Rowe shares sold to Maremont (the 216,965 owned by the trust and the 8,921 owned by the Rowes individually) yields a figure of $745,423.80.

The court denies plaintiffs' request for attorneys' fees as unauthorized by the federal securities law statutes. The court agrees with plaintiffs, however, that prejudgment interest should be awarded to make them whole for their loss and that the Illinois post-judgment interest statute provides a proper guide for determining the rate. *See Cant v. Becker,* 379 F.Supp. 972, 974–75 (N.D.Ill.1974). Under Ill.Rev. Stat., ch. 110, ¶ 2–1303, the interest rate is 9% compounded annually. Because the court awarded out-of-pocket damages and not disgorgement damages, interest should be computed from July 22, 1977, the day the Maremont funds first went into escrow to be reinvested for the Rowes' benefit.

### *Conclusion*

Accordingly, the court enters the aforementioned findings of fact and conclusions of law under Fed.R.Civ.P. 52(a). The clerk is directed to enter judgment for the plaintiffs and against the defendant in the amount of $745,423.80 with interest of 9% compounded annually from July 22, 1977 up to the date this judgment is docketed.

It is so ordered.