Herbert J. ROWE, et al.,
Plaintiffs–Appellees,
Cross–Appellants,

v.

MAREMONT CORPORATION,
Defendant–Appellant,
Cross–Appellee.

Nos. 86–2608, 86–2693.

United States Court of Appeals,
Seventh Circuit.

Argued March 31, 1987.

Decided June 24, 1988.

Rehearing and Rehearing In Banc
Denied Aug. 4, 1988.

---

Bernard J. Nussbaum, Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., for defendant-appellant, cross-appellee.

Robert W. Gettleman, D'Ancona & Pflaum, Chicago, Ill., for plaintiffs-appellees, cross-appellants.

Before RIPPLE and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

MANION, Circuit Judge.

Herbert J. Rowe, his wife, Ann M. Rowe, and the Continental Illinois National Bank [1] sued Maremont Corporation for securities fraud under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5.[2] The suit arose from a face-to-face transaction in July, 1977 in which Maremont purchased 225,986 shares of stock in Pemcor, Inc. from the Rowes. After a bench trial, the district court entered judgment for the Rowes for $745,423.80 plus prejudgment interest and costs. Maremont appeals the district court's judgment. The Rowes cross-appeal, claiming that the district court awarded inadequate damages. We reject the contentions made in both the appeal and cross-appeal, and affirm.

## I.

In a thorough published opinion, the district court set out detailed findings of fact. *Rowe v. Maremont Corp.*, 650 F.Supp. 1091, 1093–1104 (N.D.Ill.1986). Therefore, we will only summarize the pertinent facts. We will discuss any other facts necessary to our discussion of the legal issues as we discuss those issues.

In early 1977, Herbert and Ann Rowe owned 8,921 shares of stock in Pemcor, Inc. The Rowes were also co-trustees, with Continental Illinois Bank, of a trust Mrs. Rowe's father had established in his will. The trust owned 216,965 shares of Pemcor stock. Together, the Rowes' and the trust's shares comprised 11½ percent of Pemcor's outstanding stock. (We will refer to the shares collectively as the "Rowe shares" or "Rowe block," as did the district court.)

Although Pemcor was listed on the New York Stock Exchange, the Rowes could not sell their shares on the open market because the shares were not registered. The Rowe shares were also subject to an agreement between the Rowes and Potter–Englewood Corporation (the corporate predecessor to Pemcor) providing that the Rowes would not sell the shares before notifying Pemcor and receiving an opinion from Pemcor's counsel that the sale would not violate the 1933 Securities Act.

By early 1977, the Rowes had decided to sell their Pemcor shares. The Rowes ex-

---

1. When we refer to "the Rowes" in this opinion, we refer to Mr. and Mrs. Rowe and their representatives, unless context indicates otherwise.

2. Rule 10b–5 provides:
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
   (a) To employ any device, scheme, or artifice to defraud,
   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,
   (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
   in connection with the purchase or sale of any security.

plored selling the shares both by private placement and by a secondary public offering. In a secondary offering, the Rowe shares would have fetched between $5 and $6½ per share. At that time, Pemcor's market price was around $12–$13 per share.

The investment bankers whom the Rowes had contacted concerning a private placement were having no luck finding a buyer. However, at around the same time the Rowes became interested in selling their shares, Maremont had become interested in expanding its operations by acquiring new companies. As part of this expansion program, Maremont retained Skadden, Arps, Slate, Meagher & Flom, a New York law firm active in mergers and acquisitions. In January, 1977, Maremont executed a commission agreement with The Illinois Company, a Chicago brokerage firm. The Illinois Company recommended Pemcor to Maremont as a potential acquisition and arranged meetings between Pemcor's and Maremont's executives. Although the meetings were cordial, Pemcor was not interested in a merger or affiliation at that time.

Around July 13, 1977, The Illinois Company informed Richard Black, Maremont's president, that the Rowe shares might be available. On July 18, pursuant to Black's instructions, Gordon Teach of The Illinois Company offered, on behalf of an undisclosed principal, to purchase the Rowe shares for that day's closing market price, $13 per share. Although Mrs. Rowe agreed the price was good (it was, in fact, an all-time high), she refused to sell the shares without knowing the purchaser's name. Therefore, Mrs. Rowe arranged to fly from her home in Virginia to Chicago the next day to meet Teach.

Over the next three days, the Rowes and their representatives met with Maremont representatives to negotiate the stock sale. On July 19, Mrs. Rowe, the Rowes' attorney, Robert Fuchs, and two Continental Illinois trust department officers, Darryl Hoovel and Gordon Martin, met with Teach in Chicago. After Mrs. Rowe insisted on knowing the purchaser's name, Teach told her that Maremont was the purchaser. Teach asked the Rowes not to disclose Maremont's name to anybody until twenty-four hours after the sale. Teach also told the Rowes that Maremont had recently sold a division, that it wanted the Rowe shares as an investment, that it wanted to protect its investment by electing a director, and that it wanted to purchase up to 20 percent of Pemcor's stock. At the close of the meeting, Mrs. Rowe agreed to sell the Rowes' Pemcor shares to Maremont for $13 per share. Before the Rowes and Maremont could close the deal, however, they needed to agree to and prepare written documents. Therefore, further meetings were necessary.

The next day, July 20, the Rowes' representatives (but not Mrs. Rowe, who had returned to Virginia) met with Maremont representatives to negotiate the sales agreement. Early on, Milton Shapiro, Maremont's treasurer, and William Penner of The Illinois Company repeated Teach's statements that Maremont wanted to invest in Pemcor stock with cash it had from selling its division, that it wanted to elect a director, and that it wanted to acquire 20 percent of Pemcor's stock. Shapiro also stated that the funds for the purchase would be wire-transferred from California. In fact, Maremont paid for the stock with money from its revolving account with Continental Illinois.

During the afternoon of July 20, Robert Pirie and Milton Strom, two Skadden Arps lawyers, arrived to handle the transaction for Maremont. Although Maremont had specifically retained Skadden Arps to work on a possible Pemcor acquisition, Shapiro introduced Pirie and Strom as two New York lawyers in Chicago on other business who were "stopping by" to help Maremont with the Rowe transaction.

Sometime during one of the meetings, on July 20 or 21, Marvin Temple, Fuchs' law partner, asked Shapiro whether Maremont was going to make a tender offer for Pemcor. Shapiro replied, "No."

During the times relevant to this case, an FTC consent order prohibited Maremont from acquiring without FTC approval the

stock of any company "engaged in the manufacture or remanufacture or the wholesale distribution of automotive replacement parts, accessories, or equipment." Since Pemcor manufactured automotive stereo speakers, Maremont asked outside counsel whether the FTC order would prevent Maremont from acquiring Pemcor stock. Several attorneys informed Maremont that the order would not apply, although one attorney cautioned Maremont to expect a "challenge" from the FTC. John Mills, Maremont's general counsel, harbored some doubts about the issue but he never expressed those doubts to the Rowes.

During the July 20 meeting, Pirie insisted that Fuchs remove a clause stating that Maremont would "warrant and represent that we are not in competition with Pemcor" from the written documents Fuchs had prepared. This prompted Fuchs to ask whether any antitrust problems existed. Pirie replied that there were none. Based on Pirie's answer, Fuchs agreed to drop the antitrust language from the documents.

By the end of the afternoon on July 21, the Rowes and Maremont had agreed on the final form of the documents necessary to complete the sale. Those documents were: a sale agreement; an escrow agreement; a supplementary indemnification agreement; irrevocable proxies coupled with an interest; and stock powers and certificates. The parties included the escrow agreement because the Rowes could not close the deal until Pemcor's counsel issued its opinion that the sale would not violate the 1933 Securities Act. The escrow agreement was intended to lock in the $13 sales price while delaying the actual "closing" until Pemcor issued its opinion letter. Maremont and the Rowes subsequently executed all the documents.

During the days immediately following the execution of the Rowe contract, Maremont took steps to acquire the rest of Pemcor's stock. Black contacted Edward Anixter, Pemcor's president, to discuss a friendly takeover. Anixter was not receptive to the idea; a hostile tender offer thus seemed the most likely course. Skadden Arps' attorneys drafted "anticipatory tender offer documents" so that Maremont could move quickly. Maremont also arranged financing for its offer. On Friday, July 29, Black sent Anixter a "bear hug" letter advising Anixter that Maremont intended to offer $16.75 per share for all Pemcor shares. Pemcor did not respond to the letter. On August 1, Maremont publicly announced that it intended to make a tender offer. Pemcor opposed the tender offer. On August 2, Pemcor notified the FTC about the acquisition, and the FTC ordered Maremont to explain why the purchase did not violate the 1971 consent order. On August 3, Pemcor sued both Maremont and the Rowes to prevent the Rowes from transferring the shares to Maremont. Pemcor's complaint sought $30 million in damages and injunctive relief.

In the meantime, the Rowes, knowing about neither the FTC order nor Maremont's contemplated tender offer, went about the business of trying to complete the sale of their Pemcor stock. Immediately after the documents were signed, Fuchs phoned Chuck Kaufman, Pemcor's outside counsel, to ask Kaufman to cooperate in obtaining the necessary opinion letter. During that conversation, Kaufman asked Fuchs whether Maremont would make a tender offer. Fuchs replied that Maremont had advised him there would be no tender offer.

Fuchs did not learn about the FTC decree until July 29, when Kaufman called to tell him about it. Upon learning about the FTC decree, Fuchs phoned Shapiro and Mills at Maremont to ask them why nobody had told him about the order before the sale. Shapiro and Mills replied that the FTC order did not apply.

Fuchs and the Rowes learned about Maremont's tender offer on August 2. The Rowes were angry, and told Fuchs they wanted their stock back. Gordon Martin of Continental Illinois complained to Fuchs that the Rowes and the trust had been "taken." Fuchs, however, decided to move cautiously and to keep the Rowes' options open. The Rowes thus moved on a dual track, taking the necessary steps to com-

plete the transaction while at the same time exploring the possibility of rescission.

Between August 4 and August 23, Fuchs contacted Maremont representatives three times. On August 4, Fuchs wrote to Maremont concerning Pemcor's complaint and the FTC order. That letter stated only that "serious legal problems" could occur if the FTC order prevented Maremont from acquiring the Rowe shares. The letter did not mention any representations by Maremont, the tender offer, or any desire to rescind. On August 15, Fuchs spoke by phone with Pirie. Fuchs' notes of the conversation indicate that he asked Pirie why he had not told the Rowes about the FTC order. At trial, Fuchs testified that he also told Pirie that it was "incredible" that Maremont had not disclosed that it was going to make a tender offer, and that the Rowes were entitled to rescission. Fuchs did not, however, formally request rescission at that time. On August 23, Fuchs sent Maremont a letter formally requesting rescission. Although the rescission letter mentioned several alleged misstatements and omissions by Maremont (e.g., the representation that Maremont planned to obtain only up to 20 percent of Pemcor's stock), the letter did not mention Shapiro's statement that Maremont would not make a tender offer.

On August 30, the Rowes filed a counterclaim against Pemcor. Part of the relief the Rowes requested was an order directing Pemcor to transfer the Rowe shares to Maremont. On October 27, 1977, the Rowes filed a cross-claim against Maremont, alleging securities fraud (among other things). The cross-claim, like the rescission letter, did not mention the "No" tender offer representation.

The FTC eventually approved Maremont's purchase of Pemcor stock. On April 8, 1978, the escrow agent (over the Rowes' objections) delivered the Rowe shares to Maremont. Pemcor successfully rebuffed all merger attempts by Maremont until a white knight, Esmark, came to Pemcor's rescue. Pemcor merged into Esmark, and Maremont exchanged the Rowe shares for a block of Esmark shares. In August, 1979, Maremont sold the Esmark shares for $7,039,439. Thus, Maremont made a total profit of $4,056,834 from purchasing the Rowe shares.

## II.

At trial, the Rowes presented two liability theories. First, the Rowes contended that Maremont deliberately deceived them about its intent to use the Rowe shares as a springboard for acquiring Pemcor. According to the Rowes, Maremont created the false impression that it only wanted a limited amount (up to 20 percent) of Pemcor's stock as an investment, and that Shapiro, Maremont's treasurer, lied when Temple asked him whether Maremont planned to make a tender offer. The Rowes' second theory was that Maremont misrepresented and knowingly concealed the FTC order.

The district court refused to find Maremont liable based on the FTC order. 650 F.Supp. at 1111–12. The district court did find Maremont liable based upon its representations and omissions about its intent to acquire Pemcor. *Id.* at 1107–11. Specifically, the court found that Maremont falsely stated that it only wanted enough Pemcor stock to elect a director to Pemcor's board, that it intended to acquire only "up to" 20 percent of Pemcor's stock, and that it would not make a tender offer for Pemcor. The court also found that Maremont failed to disclose that 20 percent was merely a " 'fall-back' position," and that its true goal was to acquire Pemcor. *Id.* at 1110. The court found that Pemcor had a duty to disclose its control intentions because absent such disclosure, Maremont's statements about its limited investment intentions were misleading. *Id.* at 1109; *see* 17 C.F.R. § 240.10b–5(b) (making it unlawful to omit to state a material fact necessary to make other statements not misleading). The court found that the information about Maremont's intent to acquire Pemcor was material, that the Rowes reasonably relied on Maremont's misstatements, and that Maremont intended to deceive the Rowes. 650 F.Supp. at 1109–11.

Maremont challenges the district court's finding of liability on several bases. Maremont contends that the district court clearly erred in finding that Shapiro made the "No" tender offer statement to Temple and Fuchs. According to Maremont, the "No" tender offer statement was (in the district court's words) "[b]y far the most crucial of the representations ...," id. at 1107; without the "No" tender offer statement, Maremont maintains that the district court's finding of liability cannot stand. Maremont also asserts that the district court erred in finding that any alleged misrepresentations or omissions concerning its control intentions were material, that the Rowes reasonably relied on the misinformation, or that Maremont acted with scienter. We will discuss each of Maremont's contentions in turn.[3]

### 1. The "No" tender offer statement.

■ At trial, both Temple and Fuchs testified that Temple asked Shapiro if Maremont was going to make a tender offer. Fuchs and Temple testified that Shapiro answered, "No." The district court, based largely on its determination that Temple and Fuchs were credible witnesses, found that Shapiro did make the "No" tender offer statement. See 650 F.Supp. at 1107–08. We may overturn that finding only if it is clearly erroneous. Fed.R.Civ.P. 52(a); Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). "When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Id. at 575, 105 S.Ct. 1512.

Even findings ostensibly based on credibility determinations may be clearly erroneous if "[d]ocuments or objective evidence ... contradict the witness' story" or if the

witness' story is internally inconsistent. Id. Maremont asserts that the district court's finding that Shapiro made the "No" tender offer statement is clearly erroneous because the extrinsic and documentary evidence contradict Fuchs' and Temple's testimony. The "No" tender offer statement appears in none of the relevant documents, including the transaction documents, Fuchs' detailed notes of the negotiations, Fuchs' August rescission letter, and the Rowes' original cross-claim against Maremont. Moreover, no Rowe representative ever mentioned the "No" tender offer statement until Temple mentioned it in his deposition two years after the transaction. Finally, Maremont points out that Fuchs' characterization of Shapiro's statement as "dramatic" contradicts the district court's findings that the statement occurred in a "side exchange," 650 F.Supp. at 1108, and that only Fuchs and Temple heard the statement.

Despite what Maremont would have us believe, the district court did not base its finding that Shapiro made the "No" tender offer statement on whim or caprice; instead, the district judge carefully considered and analyzed all the evidence in light of Maremont's contentions. See id. at 1107–08. We need not repeat the district court's analysis. We note, though, that Fuchs' statement to Kaufman, Pemcor's outside counsel, that Maremont had told him there would be no tender offer corroborates Fuchs' and Temple's testimony. Maremont does not challenge the district court's finding that Fuchs made this statement. Based on this corroborating evidence, the district court's careful analysis, and the district court's unique opportunity to evaluate witness credibility, we find that the district court did not clearly err in finding that Shapiro made the "No" tender offer statement.

### 2. Materiality and Reliance.

■ A court may predicate Rule 10b–5 liability only on material omissions or mis-

---

3. Because we affirm the district court's decision finding Maremont liable based upon its misrepresentations and omissions regarding its intent to acquire Pemcor, we need only state regarding the Rowes' alternate liability theory that we

agree with the district court's analysis and its decision not to base liability on Maremont's failure to disclose the FTC order. See 650 F.Supp. at 1111–12.

statements. An omission or misstatement is material if a substantial likelihood exists that a reasonable investor would find the omitted or misstated fact significant in deciding whether to buy or sell a security, and on what terms to buy or sell. *Basic, Inc. v. Levinson,* — U.S. ——, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988); *see also Michaels v. Michaels,* 767 F.2d 1185, 1194–95 (7th Cir.1985); Robert Clark, *Corporate Law* § 8.10.4 (1986). Put another way, an omission or misstatement is material under Rule 10b–5 if it is substantially likely that a reasonable investor would have viewed the omitted or misstated fact as significantly altering the " 'total mix' of information made available.' " *Levinson,* 108 S.Ct. at 983 (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).

■ Besides showing that the defendant's misrepresentations and omissions were material, a plaintiff must also show a causal connection between his decision to buy or sell securities and the defendant's misconduct. *See Levinson,* 108 S.Ct. at 992; *Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1283–84 (9th Cir.1982); *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 92 (2d Cir.1981). Reliance is one way to supply this casual connection. *Levinson,* 108 S.Ct. at 989; *Bell,* 669 F.2d at 1283; *Wilson,* 648 F.2d at 92; *see also Kademian v. Ladish Co.,* 792 F.2d 614, 627–28 (7th Cir.1986) (linking reliance and causation). To say that a plaintiff "relied" on a defendant's misstatement or omission is to say that the plaintiff's belief in the defendant's misstatement or omission played a substantial part in the plaintiff's investment decision. *See Wilson,* 648 F.2d at 92 n. 6; *see also Bell,* 669 F.2d at 1283 ("A finding of nonreliance implies that plaintiffs would have acted no differently had they known the truth.")[4]

Courts have traditionally held that a plaintiff's reliance must be reasonable or "justifiable." *See* Thomas Hazen, *Securities Regulation* § 13.5, at 464–65. But in *Flamm v. Eberstadt,* 814 F.2d 1169 (7th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987), we stated that " 'reliance' means only materiality and causation in conjunction," and that reliance is no longer "an element independent of causation and materiality in a case under Rule 10b–5." *Id.* at 1173, 1174; *see also Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 527–30 (7th Cir. 1985). As we have discussed, showing that a plaintiff relied on a defendant's misstatement is simply one common way to demonstrate the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell. Under *Flamm* and *Angelos,* materiality subsumes justifiability; if a plaintiff relies on a material misstatement, his reliance is justifiable. This is logical because to say a fact is material is to say that a *reasonable* investor, knowing what the plaintiff knew, would have considered the information important in determining whether to buy or sell. *See Levinson,* 108 S.Ct. at 983; *Flamm,* 814 F.2d at 1173. The upshot of all this is that to recover on their Rule 10b–5 claim, the Rowes had to show: that a reasonable investor knowing what the Rowes knew would have viewed the information about Maremont's intent to

---

**4.** A plaintiff does not always have to prove reliance to recover damages in a Rule 10b–5 action. For example, a plaintiff need not prove reliance where he can otherwise establish a causal connection between his investment decision and the defendant's misconduct. *See Bell v. Cameron Meadows Land Co.,* 669 F.2d at 1283–84 (finding sufficient causation where "misstatements and omissions caused other shareholders to tender 80% of the outstanding shares, and the success of the tender offer caused plaintiffs ... to tender their shares as well," even if plaintiffs themselves did not rely on the defendant's misrepresentations). Also, in face-to-face transactions involving only material omissions, a plaintiff need not prove re-

liance; the omission's materiality and the defendant's duty to disclose supply the requisite causation. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). At trial the Rowes, citing *Affiliated Ute,* argued that they had no obligation to prove that they relied on omitted facts. Because this case involves misstatements and half-truths, and not "pure omissions," the district court correctly rejected the Rowes' contention. *See* 650 F.Supp. at 1105. The Rowes have offered no other theory to link Maremont's misconduct to their decision to sell their stock to Maremont for $13 per share other than their reliance on Maremont's misstatements; therefore, the Rowes had to prove reliance.

acquire Pemcor significant in deciding whether and on what terms to sell their Pemcor stock to Maremont; and that Maremont's misstatements about its intent to acquire Pemcor caused the Rowes to sell on the terms they did (in this case by showing that they relied on Pemcor's misstatements).

█ Appellate courts will normally reverse a district court's findings of materiality and reliance only if those findings are clearly erroneous. *See, e.g., Lucas v. Florida Power & Light Co.,* 765 F.2d 1039, 1040–41 (11th Cir.1985). Maremont, however, urges us to adopt what it calls a "put-it-in-writing" rule. According to Maremont, "when there is a negotiated contract pertaining to the sale of securities, failure to state an oral representation in the written agreement ... precludes later contention by the party drafting the agreement that the oral representation was material or that the drafter could justifiably rely on it."

In a common law fraud case, we rejected an argument similar to the argument Maremont makes and held instead that the trier-of-fact can best decide whether a plaintiff reasonably relied on a defendant's misstatements. *Contractor Utility Sales Co. v. Certain–Teed Products Corp.,* 638 F.2d 1061, 1083 (7th Cir.1981). Maremont protests that *Contractor Utility* should not apply in a Rule 10b–5 action because common law fraud requires a more stringent standard of proof (clear and convincing) than a Rule 10b–5 claim (which requires proof by a preponderance of the evidence). This distinction, however, is not controlling. The district court correctly applied *Contractor Utility* in holding that the Rowes' failure to reduce Maremont's misrepresentations to writing in the final agreement

did not defeat materiality and reliance as a matter of law. *See* 650 F.Supp. at 1106.

The Supreme Court's recent discussion of materiality in *Basic, Inc. v. Levinson, supra,* reinforces our holding. In *Levinson,* the Court rejected the proposition that preliminary merger discussions are not material as a matter of law until the would-be merger partners agree in principle to the merger's price and structure. 108 S.Ct. at 983–86. The Court also rejected the opposite proposition that merger discussions are always material if the corporation denies the discussions. *Id.* at 986. The Court stressed that determining whether a misstatement or omission is material " 're-quires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him....' " *Id.* at 985–86 (quoting *TSC Industries,* 426 U.S. at 450, 96 S.Ct. at 2133). Materiality is necessarily a fact-specific inquiry, so "any approach that designates a single fact or occurrence determinative of ... materiality must necessarily be over or underinclusive." *Id.* 108 S.Ct. at 985; *see also McGrath v. Zenith Radio Corp.,* 651 F.2d 458, 466 (7th Cir.1981) (Materiality is a question "peculiarly ... for the trier of fact.")

Reliance, like materiality, also depends on each case's facts. A plaintiff's failure to insist that a defendant put his representations in writing may indicate that the plaintiff did not consider the representation important. Other facts, however, may explain that failure. As with materiality, the trier-of-fact is best able to sort out the conflicting evidence and inferences to determine if a plaintiff did, in fact, rely on the defendant's misstatements. For these reasons, we reject Maremont's proposed "put-it-in-writing" rule.[5]

---

**5.** All this is not to say that materiality and reliance may never be foreclosed as a matter of law by what the parties include or exclude in a written agreement. *See, e.g., Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1518 (10th Cir.1983) (plaintiff's 10b–5 action was foreclosed as a matter of law because defendants had provided him with specific written information that contradicted their oral misrepresentations); *Robinson v. Cupples Container Co.,* 513 F.2d 1274, 1277 (9th Cir.1975) (as a matter of law, no reasonable

investor would attach importance to earlier representations which the defendants refused to include in the final written agreement); *see also Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1322 (7th Cir.1988); *Angelos,* 762 F.2d at 529–30. In this case, the written agreement between the Rowes and Maremont did not contradict Maremont's representations and the failure to include the representations in the agreement did not result from Maremont refusing to

■ The district court found, as matters of fact, that Maremont's misstatements and omissions concerning its intent to acquire Pemcor were material, and that the Rowes relied on Maremont's statements. Maremont contends these findings are clearly erroneous.

Whether information concerning speculative or contingent events (such as a possible future tender offer) is material depends " 'upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.' " *Basic, Inc. v. Levinson*, 108 S.Ct. at 986–87 (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir.1968)). That balancing supports the district court's conclusion that the information concerning Maremont's intent to acquire Pemcor was material. Maremont had been interested in merging with or acquiring Pemcor for seven months before it learned about the Rowe stock, and had taken a number of actions to pursue that interest. *See* 650 F.Supp. at 1094–95. Moreover, "[t]ender offers entail substantial premia compared with the prices shares carry before the bids—and afterwards, should the offers be defeated." *Flamm*, 814 F.2d at 1174. That this is so was illustrated in this case by Maremont's "bear hug" letter, announcing to Pemcor its intent to make a cash tender offer for all outstanding Pemcor shares at $16.75 per share—a price more than one point above Pemcor's market price on that date, and well above the $13 per share Maremont paid the Rowes. *See* 650 F.Supp. at 1101, 1104. These facts, standing alone, would allow the district court to conclude that Maremont's intent to acquire Pemcor would have been significant to a reasonable investor in deciding whether to sell Pemcor stock at $13 per share.

The facts we have noted, however, did not stand alone, and materiality depends in any given case upon whether a certain bit of information would have affected the "total mix" of information available to the plaintiff. *See Levinson*, 108 S.Ct. at 983; *Flamm*, 814 F.2d at 1174. Maremont argues that the Rowes possessed reliable information that contradicted any information it withheld from or misstated to them about its intent to acquire Pemcor. Specifically, Maremont argues that during the negotiations Pirie informed the Rowes that, "Maremont might well have intentions with respect to the securities of Pemcor, other than simply the purchase of this interest of the Rowes...." Maremont also argues that at a breakfast meeting with Mr. Rowe, Edward Anixter, Pemcor's president, told Mr. Rowe that "obviously if they are buying your shares of stock, they are probably going to buy the rest of the company." Finally, Maremont argues that Maremont's willingness to pay market price for restricted shares indicated that Maremont might have had acquiring control of Pemcor in its plans. According to Maremont, all this information should have put the Rowes on notice that any statements by Maremont representatives indicating that Maremont did not intend to acquire all of Pemcor's stock were false.

Having sufficient information to call a representation into question may preclude an investor from later claiming that the representation was material. *See Angelos*, 762 F.2d at 530; *Flamm*, 814 F.2d at 1173. This flows logically from the definition of materiality: information is material only if it " 'significantly alter[s] the "total mix" of information' that the investor possesses." *Angelos*, 762 F.2d at 530; *see also Flamm*, 814 F.2d at 1173. But not all information that may cast some doubt on a representation's reliability will automatically preclude materiality. "Knowledge of a risk does not prevent recovery if the additional information *would* have been a significant increment to the total available knowledge." *Flamm*, 814 F.2d at 1173. (Emphasis in original.) The trier-of-fact is best able to sort out the "total mix" of information and determine whether the plaintiffs were even aware of certain information, whether that

make written representations. Therefore, the district court properly determined that material-

ity and reliance were questions of fact.

information actually conflicted with the representation at issue, and whether, if conflicting, that information was sufficient to put the plaintiffs on notice that contrary representations were not reliable.

The district court did not clearly err in finding that Maremont's misstatements and omissions about its control intentions were material, despite the alleged mixed signals. The Rowes presented witnesses at trial who consistently testified that Maremont never revealed that it wanted the Rowe stock as a springboard for acquiring Pemcor. On the other hand, the district court found Pirie's deposition testimony somewhat vague. Pirie did not testify at trial, so the district court had no opportunity to question him about specific statements. After reviewing the record, we cannot say the district court clearly erred in finding Pirie's testimony "insufficient to outweigh the live, credible, consistent and contrary testimony of the Rowe witnesses." 650 F.Supp. at 1107.

Furthermore, the district court did not clearly err in finding liability even in light of Anixter's statement and the fact that Maremont paid market price for restricted stock. Anixter never mentioned his contacts with Black to Mr. Rowe. Nor did Anixter mention Maremont's interest in acquiring Pemcor. At most, Anixter merely informed Rowe that companies who buy large blocks of another company's stock often make tender offers for the rest of the company's stock. This was not the kind of firm-specific information that would have "necessarily giv[en] [the Rowes] a reason for disbelieving Maremont's inconsistent representations." *Id.* at 1110; *cf. Flamm,* 814 F.2d at 1173. Likewise, the fact that Maremont paid the Rowes market price for restricted shares was not something that would necessarily lead somebody to believe that Maremont's representations about its limited intentions were untrue.

Maremont also argues that the district court clearly erred in finding that the Rowes relied on Maremont's misstatements about its intentions. According to Maremont, several facts disprove reliance. The Rowes did not mention either the "No" tender offer statement, or Maremont's statements concerning its intentions, in the written agreement. Furthermore, Fuchs failed to include the "No" tender offer statement in the contemporaneous written notes he kept of the negotiations. In fact, no Rowe representative mentioned the "No" tender offer statement to Maremont until Temple mentioned it in his deposition, two and one-half years after Shapiro made it. Maremont also asserts that the Rowes' post-transaction conduct disproves reliance. Briefly stated,[6] after the transaction, Fuchs did not object immediately to Maremont's alleged fraud but instead went forward with the deal. The Rowes did not formally demand rescission until three weeks after learning about the tender offer. Moreover, while the Rowes eventually filed a cross-claim against Maremont seeking damages under Rule 10b-5, they had previously filed a counterclaim against Pemcor, requesting that Pemcor transfer the Rowe shares to Maremont, and pressed forward with that counterclaim until Pemcor dismissed its suit. According to Maremont, all these facts show that the Rowes simply did not care about Maremont's intentions toward the rest of Pemcor's stock and that the Rowes would have sold their stock to Maremont for $13 per share even if they had known the truth.

On the record before us, we do not find that the district court clearly erred in finding reliance. Mr. and Mrs. Rowe both testified that if they had known the truth they would not have sold the stock to Maremont on the terms they did. Fuchs testified that if he had known the truth he would have advised the Rowes not to sell the stock for $13 per share. Hoovel and Martin (two Continental Bank officers with no financial interest in the litigation) also testified that if they had known the truth they would have attempted to negotiate for a higher price. The district court was entitled to credit the Rowes' witnesses' testimony.

6. The district court extensively discussed the Rowes' post-transaction conduct. *See* 650 F.Supp. at 1101–03.

Fuchs' failure to mention the "No" tender offer statement could raise the inference that he did not consider Maremont's intent or lack of intent to acquire Pemcor important. The district court, based on Fuchs' testimony, concluded instead that Fuchs simply forgot to mention the statement because he considered it unremarkable in light of Maremont's earlier representations about its limited intentions regarding Pemcor. 650 F.Supp. at 1108. This may show bad judgment on Fuchs' part but it does not automatically preclude reliance. Fuchs' statement to Kaufman that Maremont had told him it would not make a tender offer also supports the district court's finding that Fuchs believed Maremont's representations and acted on that belief.

The Rowes' failure to put Maremont's representations into the written agreement could also raise an inference that the Rowes were not concerned about what Maremont did in the future with Pemcor. However, the district court found that the Rowes' failure to include the representations in the agreement "was predicated on their impression that Maremont had only limited intentions at the time of purchase." *Id.* at 1110. In other words, the written agreement's contents were a product of Maremont's misrepresentations and omissions. Again, this may show poor judgment but it does not necessarily preclude reliance.

We also agree with the district court that the Rowes' post-transaction conduct did not necessarily disprove reliance. It is true that Fuchs did delay in complaining to Maremont about its deception. But Martin, the Continental Bank officer, testified that immediately after hearing about Maremont's proposed tender offer he told Fuchs that the Rowes had been "taken," and the Rowes testified that they wanted their stock back right away but followed Fuchs' advice to be cautious. Moreover, Pemcor had sued the Rowes on August 2 for $30 million; this understandably dictated caution before entering an adversary relation-

ship with Maremont. The Rowes did finally demand rescission on August 23 (three weeks after the Rowes learned about Maremont's planned tender offer); their rescission letter specifically mentioned that Maremont had lied and omitted information about its intent to acquire Pemcor (although it did not mention the "No" tender offer statement). *See* 650 F.Supp. at 1103. Under the circumstances, we agree with the district court that the three-week delay in requesting rescission was "not an excessive period...." *Id.* at 1110.

The Rowes' decision to go forward with the transaction while deciding whether to seek rescission or damages from Maremont, and the Rowes' decision to press forward with their counterclaim against Pemcor also do not necessarily defeat reliance. It was understandable that the Rowes would try to extricate themselves from their predicament by applying pressure on Pemcor as well as Maremont. We also agree with the district court that to automatically preclude reliance because of the Rowes' decision to press their counterclaim against Pemcor would "penalize them for exercise of their right to make inconsistent pleadings under Fed.R.Civ.P. 8(e)(2)." 650 F.Supp. at 1111 (citing *Continental Ins. Co. v. Sherman*, 439 F.2d 1294, 1298 (5th Cir.1971)).

The trial judge carefully analyzed the conflicting evidence concerning materiality and reliance in light of Maremont's arguments and her ability to observe and judge the witnesses' credibility. Materiality and reliance presented close questions that a different judge might have reasonably decided differently. But on the record before us, we cannot say that the district court clearly erred in finding that Maremont's misstatements and omissions were material and that the Rowes relied upon those statements in deciding to sell their stock to Maremont. *See Anderson v. Bessemer City*, 470 U.S. at 574, 105 S.Ct. at 1511 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.")[7]

---

7. Maremont perfunctorily argues that the Rowes could not base their Rule 10b–5 action

on any statements Maremont made after July 19 (including Shapiro's "No" tender offer state-

### 3. *Scienter*

■ A plaintiff may not recover in a Rule 10b–5 action unless he proves the defendant acted with scienter—that is, intent to defraud, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed. 2d 668 (1976), or reckless disregard for the truth of his representations, *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1039–40, 1043–45 (7th Cir.1977); *see also* Thomas Hazen, *Securities Regulation* § 13.4 (1986). Maremont contends that the Rowes failed to prove scienter. We conclude, however, that the district court did not clearly err in finding that Maremont acted with scienter.

■ There is sufficient evidence to support a finding of scienter. Both Teach and Shapiro (Maremont's treasurer) misstated to the Rowes that Maremont wanted the stock only for investment purposes. As the district court recognized, these vague statements regarding investment purposes would probably have not been significant in themselves. *See* 650 F.Supp. at 1109. But Teach and Shapiro made these statements in conjunction with statements that Maremont wanted to elect a director to Pemcor's board to protect its investment and that it wanted to purchase up to the amount of shares necessary to elect a director, "which in turn meant 20%." *Id.* Both these statements had little, if any, factual basis. Moreover, the district court was

> struck by certain collateral misrepresentations.... First, both Teach and Shapiro represented Maremont's recent sale of a division and consequent cash on hand as reasons for the investment when these events were irrelevant to Maremont's interest in Pemcor. Second, Shapiro said that the Skadden, Arps lawyers were just "stopping by" as if to minimize the significance of Maremont not being represented by its usual attorneys....

> Third, Shapiro said that the cash would be wired in from California upon closing of the deal, in support of the story that sale proceeds were being reinvested, whereas Maremont in fact used its revolving credit from Continental [Illinois Bank] to finance the purchase.

650 F.Supp. at 1109. Teach's and Shapiro's consistent and repeated misstatements about Maremont's limited intentions, along with the "collateral misrepresentations" led the district court to infer that Maremont was trying to create a smokescreen to hide its control intentions. *Id.* at 1109. This inference supports a finding that Maremont intended to deceive the Rowes.

The district court also found that "Shapiro was informed about Maremont's possible course of action, and thus knew or must have known" that his "No" tender offer statement was misleading. *Id.* at 1107. This finding was not clearly erroneous. Shapiro's knowing misstatement also supports the inference that he intended to deceive the Rowes. *See Michaels v. Michaels*, 767 F.2d at 1199.

Maremont argues that the district court improperly based scienter on Teach's statements because there was no evidence that anybody from Maremont authorized Teach to make statements about Maremont's intentions or that anybody from Maremont knew what Teach said to any Rowe representatives. Maremont also argues that it makes no sense to base scienter on Teach's statements: why, Maremont queries, would Teach have risked blowing his commission by lying about Maremont's business plans?

Maremont's argument is unpersuasive. The district court found that Teach acted as Maremont's agent. *Rowe v. Maremont Corp.*, No. 77 C 2837, slip op. at 1 n. 1 (N.D.Ill. Aug. 28, 1986) (unpublished opinion on Maremont's Motion to Amend) [available on Westlaw, 1986 WL 9753]

---

ment) because the Rowes testified that they had made their deal with Maremont on that date. *See LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931–32 (7th Cir.1988) (misrepresentations made after an investor is legally committed to a sale or purchase cannot form the basis for a Rule 10b–5 action). While Maremont correctly states the general principle, that principle does not apply in this case. The record indicates that the Rowes could have backed out of the deal or renegotiated the price up until they had agreed on the final documentation. Thus, statements made up until that time could have affected the Rowes' investment decision to sell their stock to Maremont for $13 per share.

(hereinafter cited as Supplemental Opinion). This finding is not clearly erroneous. Teach was president of The Illinois Company, which had been working with Maremont in its attempts to acquire Pemcor since January, 1977. Also, Shapiro, who knew about Maremont's possible course of action, repeated the same misstatements that Teach had made, indicating that Shapiro and Teach were working together. Therefore, the district court properly considered Teach's remarks in determining Maremont's scienter.

Maremont also argues that the district court could not properly base scienter on Maremont's representations about its limited intentions. According to Maremont, Fuchs knew that any statement about limited intentions was inconsistent with Maremont's expressed desire to elect a director because Fuchs knew that electing a director required majority control. In fact, Fuchs included a provision in the agreement spelling out Pemcor's board's structure so Maremont would know that it could not force a director onto the board with only 20 percent of Pemcor's stock. Maremont contends that neither Teach nor Shapiro ever said Maremont would purchase "up to" 20 percent; instead, Teach told Mrs. Rowe that Maremont wanted to elect a director and Mrs. Rowe responded that electing a director would take 20 percent. From this, Maremont argues that "[t]he statement concerning election of a director is significant to scienter only if one assumes that when Mr. Teach raised the directorship issue, he foresaw that Mrs. Rowe would erroneously state that Maremont could elect a director of its choice if it held 20 percent of Pemcor's stock and that lawyer Fuchs would not correct her, leaving her in a state of misimpression."

Much of Maremont's argument is an attack on the district court's finding that Teach told Mrs. Rowe that Maremont intended to purchase "up to" 20 percent of Pemcor's stock. That finding, however, is not clearly erroneous. Although there are parts of Mrs. Rowe's cross-examination that when read in isolation indicate that Mrs. Rowe told Teach that it would take 20 percent to elect a director, other parts of her testimony indicate that Teach told her that Maremont intended to purchase *up to* 20 percent of Pemcor's stock. Other Rowe witnesses testified consistently with, and Hoovel's and Fuchs' contemporaneous memoranda corroborate, this interpretation.[8]

Unless the district court clearly erred in determining that Teach told Mrs. Rowe that Maremont intended to purchase up to 20 percent of Pemcor's shares, we fail to see how Fuchs' knowledge that electing a director required control affects Maremont's scienter.[9] Scienter depends on *Maremont's* representatives' intent; Fuchs' knowledge is irrelevant to that intent unless Maremont's representatives knew what Fuchs knew. Maremont does not argue that either Teach or Shapiro had any special insight into Fuchs' mind.

Maremont finally argues that it was improper for the district court to infer scienter from the "collateral misrepresentations." Maremont argues that, if anything, Shapiro's statements about available cash, and the presence of Skadden Arps' attorneys would have been more likely to tip off the Rowes that something was up rather than to deceive them. After all, knowing that Maremont had ready cash would have tended to show that Maremont had the wherewithal to bid for Pemcor control. Moreover, Skadden Arps had made its name in large part by its involvement in

---

8. Maremont notes that none of its representatives ever promised the Rowes that it would stop buying Pemcor shares when it acquired 20 percent. This argument is beside the point. Even if nobody ever "promised" the Rowes that Maremont would stop buying at 20 percent, the district court was entitled to find that Maremont attempted to convey the false impression that its intentions with respect to Pemcor were limited and did not include a control acquisition.

9. Curiously, Maremont does not argue that Fuchs' knowledge defeats either materiality or reliance. Maremont's failure to argue Fuchs' knowledge in the contexts of materiality or reliance deprived the Rowes of an opportunity to respond and to argue why those facts would not defeat materiality or reliance. We therefore have not analyzed how Fuchs' knowledge affects materiality and reliance.

acquisitions. Maremont argues that given these facts, Shapiro could not have intended to deceive the Rowes through the "collateral misrepresentations."

Maremont's argument misses the point. The "collateral misrepresentations" support a finding of scienter because Maremont had no reason to lie about how it was paying for the stock or why the Skadden Arps attorneys were present. Maremont itself offers no other reason for these misstatements. The district court reasonably concluded that the "collateral misrepresentations" were part of Maremont's efforts to mislead the Rowes about its intent to acquire Pemcor.

Although evidence of Maremont's scienter was not overwhelming, Maremont has not persuaded us that the district court clearly erred in finding that Maremont intended to deceive the Rowes.

### III.

The district court awarded the Rowes $745,423.80 in damages. Both the Rowes and Maremont challenge the district court's damage award. The Rowes complain that the district court did not award enough damages; Maremont contends that the district court should not have awarded any damages.

In awarding damages the court's intent was "to estimate what higher price the Rowes would have been able to negotiate from Maremont in the event of full and fair disclosure, by reference to the approximate market value of the information." Supplemental Opinion at 6. In determining this higher price, the court considered Pemcor's performance in the market for a reasonable time after Maremont announced its intent to make a tender offer as well as evidence that the Rowes would have negotiated for and that Maremont would have paid a 25 percent premium had the Rowes known the truth.

The district court made several key findings regarding damages. The court found that the Rowes were eager to sell, and that they would not have held onto their Pemcor stock even had Maremont not come along. 650 F.Supp. at 1114. The court also found

that had the Rowes known the truth, they would have negotiated for a 25 percent premium from Maremont. The court found no evidence that Maremont would have rejected a demand for a premium, Supplemental Opinion at 5, and noted that "Maremont had been willing to pay [the Rowes] market price for their [restricted] stock ... and might have been willing to pay more had plaintiffs negotiated for the same." Supplemental Opinion at 2. Implicit in the above findings is a finding that Maremont would have paid a premium over market price for the Rowe shares had the Rowes asked for it. In fact, the court noted that the price per share it awarded as damages was close to the 25 percent premium Fuchs testified he would have sought had he known the truth. 650 F.Supp. at 1115.

The Supreme Court has broadly stated that in Rule 10b–5 cases involving defrauded sellers, "the correct measure of damages ... is the difference between the fair value of all the ... seller received and the fair value of what he would have received had there been no fraudulent conduct, except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972) (citations omitted). Based on this statement in *Affiliated Ute*, the Rowes argue that the district court should have ordered Maremont to pay them the over $4,000,000 profit it eventually made from purchasing the Rowe shares.

Despite its broad language in *Affiliated Ute*, the Court has not set any hard and fast rule concerning disgorgement of profits. *Cf. Randall v. Loftsgaarden*, 478 U.S. 647, 106 S.Ct. 3143, 3155, 92 L.Ed.2d 525 (1986) (leaving open the question whether plaintiffs in Rule 10b–5 actions are "invariably" free to elect disgorgement). It is within the district court's discretion to determine whether disgorgement or some other damage measure is appropriate. *Arrington v. Merrill Lynch, Pierce, Fenner, & Smith*, 651 F.2d 615, 621 (9th Cir.1981). "The court's function is to fashion the rem-

edy best suited to the harm." *Id.; Nye v. Blyth Eastman Dillon & Co.*, 588 F.2d 1189, 1198 (8th Cir.1978); *see also Hackbart v. Holmes*, 675 F.2d 1114, 1121 (10th Cir.1982); *Osofsky v. Zipf*, 645 F.2d 107, 111 (2d Cir.1981).

▮ The district court properly rejected the Rowes' disgorgement request. Being a rescissionary measure of damages, disgorgement is meant to place a defrauded seller in the same position he would have occupied had the buyer's fraud not induced him to enter the transaction. *See Nelson v. Serwold*, 576 F.2d 1332, 1339 (9th Cir. 1978). Disgorgement also prevents a defendant from being unjustly enriched by his fraud. *Randall*, 106 S.Ct. at 3153; *Hackbart*, 675 F.2d at 1122. Making Maremont disgorge all its profit from purchasing the Rowe shares would accomplish neither of these purposes. Since the Rowes would have sold their Pemcor stock absent Maremont's fraud none of the profit Maremont made from the Rowe shares (besides that representing the higher purchase price the Rowes would have received from Maremont had the Rowes known the truth) would have accrued to the Rowes; thus, disgorgement is not necessary to place the Rowes in the same position they would have occupied but for the fraud. *See Capital Investments, Inc. v. Bank of Sturgeon Bay*, 430 F.Supp. 534, 537 (E.D.Wis.1977) ("[W]here it is shown that the seller would not have retained the securities had full disclosure been made, there is no reason to allow the plaintiff accrued profits as damages"), *aff'd*, 577 F.2d 745 (7th Cir.1978); *see also Myzel v. Fields*, 386 F.2d 718, 744–45 (8th Cir.1967) (approving a jury instruction telling the jury before determining damages to consider whether the plaintiffs would have sold the stock to the defendants or retained the stock if they had known the truth); *cf. Donovan v. Bierwirth*, 754 F.2d 1049, 1057 (2d Cir.1985) (collecting cases and stating that "courts have allowed recovery only of profits earned up to a reasonable time after the information has been made public, on the theory that upon disclosure, the defrauded seller could have replaced the securities and himself earned the additional profits.");

*SEC v. MacDonald*, 699 F.2d 47, 52 (1st Cir.1983) (en banc). And since Maremont would have obtained the stock from the Rowes even absent its fraud, any profit it earned above the premium it would have paid the Rowes absent the fraud is not unjust enrichment.

The Rowes argue that what would have happened if they had not sold to Maremont is speculative and in such a case courts should give plaintiffs—the defrauded parties—the benefit of the doubt and require defendants to disgorge their profits. We have no quarrel with this general principle—after all, "[i]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them." *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir.1965). The problem here is that the district court did not have to "speculate"—in the legal sense—about the Rowes' course of conduct absent the fraud. There was more than sufficient evidence to support the court's finding that the Rowes would have sold their stock even absent Maremont's fraud.

The Rowes also argue that what they would have done absent the fraud is irrelevant because disgorgement is based on "simple equity" and on deterring fraudulent conduct. Deterrence is an important consideration in allowing disgorgement, *see Randall*, 106 S.Ct. at 3154, but "[d]isgorgement is remedial and not punitive." *MacDonald*, 699 F.2d at 54 (quoting *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir.1978)). To make Maremont pay back profits that it would have made even if it told the truth is harsh and punitive. Equity requires only that a defendant give up its *unjust* enrichment. The district court did not err in rejecting full disgorgement as a measure of damages.

Maremont argues that the district court erred in awarding the Rowes any damages at all. The district court found that if Maremont had not come along, the Rowes would have sold their stock at a secondary offering for much less than the $13 per share they received from Maremont. Since the Rowes received more by selling their shares to Maremont than they would have

if they had not sold to Maremont, Maremont contends that its fraud did not damage the Rowes. The problem with this argument is that Maremont *did* come along, and *did* induce the Rowes to sell their stock for $13 per share by lying about its intent to acquire Pemcor. Therefore, the district court correctly determined that it could base a damage award on the difference between what the Rowes actually received and what the Rowes would have received had Maremont not committed fraud. *See Affiliated Ute,* 406 U.S. at 155, 92 S.Ct. at 1473.

Maremont also argues that no evidence supports the district court's damage award. In determining how much the Rowes would have received if they had known the truth, the district court examined evidence of Pemcor's performance in the market to determine the value the market placed on the tender offer information. The district court found that

Maremont's purchase of the Rowe shares was publicly announced the same day that Pemcor announced a substantial improvement in earnings: the stock (which had been inching up the entire period of the Rowe–Maremont negotiations) jumped over one point the next trading day to a high of 16.5. The stock then dropped to around 15, but climbed up again to 16.3 shortly after Maremont announced its tender offer. The stock price thereafter fluctuated and dropped below 16 until mid-November. Not until November 22, 1977 did the stock price again exceed 16.3.

650 F.Supp. at 1114–15. From this market evidence, the court concluded that by the market's evaluation of the information 16.3 represented a likely negotiated price between the Rowes and Maremont, and that the difference between 16.3 and the $13 per share Maremont paid the Rowes was the proper damage amount. Supplemental Opinion at 6.

■ Maremont argues that the district court could not rely on the market information because the Rowes offered no expert testimony to demonstrate how much of the rise in Pemcor's stock price was caused by

the tender offer information. While it is true that Pemcor's stock price rose to 16.5 after it announced substantial increases in dividends and earnings, the price fell to 15 during the next week and did not rise again until after Maremont announced its intention to make a tender offer. This raises the inference that the tender offer was a substantial factor in Pemcor's increased price. Even if other factors caused part of the price increase, it was Maremont's burden to present evidence to segregate those factors. *See Daniels Towing Service, Inc. v. Nat Harrison Associates,* 432 F.2d 103, 106 (5th Cir.1970) ("once illicit damage of consequence is established, the burden of segregating damages should be on the [defendant]"); *Meyers v. Moody,* 475 F.Supp. 232, 248 (N.D.Tex.1979), *aff'd,* 693 F.2d 1196 (5th Cir.1982) (applying *Daniels* in a Rule 10b–5 action). Maremont did not meet this burden.

Moreover, Maremont's attack on the district court's use of the market evidence misses the mark because the market evidence was not the only evidence the district court relied on in determining damages. The district court also relied on evidence that the Rowes would have received a 25 percent (or $3.25 per share) premium from Maremont had Maremont disclosed its intent to make a tender offer. This evidence reinforces the inference raised by the market evidence that the Rowes would have been able to negotiate for a price near $16.30 per share had they known the truth.

Maremont protests that there was no evidence that the Rowes would have received, or that Maremont would have paid, more than $13 per share. However, several of the Rowes' witnesses, including Fuchs, testified that they would have negotiated for a premium had they known the truth. Jerry Williams, who headed Maremont's corporate planning department, testified by deposition that Maremont normally paid a 25 percent premium for control stock. There was no evidence that Maremont would not have paid a premium if the Rowes had asked for one.

Maremont points out that the Rowes' stock was unregistered and restricted, and

therefore incapable of being sold on the market. But Maremont did not want the stock for resale; it wanted the stock for control. Maremont could vote the stock like any other stock, and the Rowe shares represented the largest single bloc of Pemcor stock. Maremont had been pursuing Pemcor for some time, so it seems unlikely that Maremont would have simply given up and walked away from the bargaining table had the Rowes asked for more money. Given Maremont's control intentions, it was reasonable to conclude that the Rowe shares were just as (or almost as) valuable to Maremont as any other Pemcor stock (for which Maremont was willing to pay $16.75 per share); therefore, the district court could conclude that Maremont would have paid a premium over market to get the Rowe shares, even though the stock was not marketable.

Taken together, the market evidence and the evidence that Maremont likely would have paid a premium if it had told the truth support the district court's damage award. Although a damages award based on a purchase price of $16.30 per share is slightly higher than the 25 percent premium the Rowes testified they would have asked for, this difference does not require us to reduce the damages. A district court need not calculate damages with mathematical precision; it is enough that the evidence be sufficient to allow the district court to intelligently estimate damages. *See Feldman v. Pioneer Petroleum, Inc.*, 813 F.2d 296, 301 (10th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987); *Freight Terminals, Inc. v. Ryder System, Inc.*, 461 F.2d 1046, 1053 (5th Cir.1972).

### IV.

■ Maremont argues that the district court erred by awarding the Rowes prejudgment interest. According to Maremont, the interest award is punitive because "any damage award puts the Rowes ahead of where they would have been had the Maremont deal not been done." This argument is simply a variation of Maremont's argument that the Rowes suffered no damages, and we have already rejected that argument. The decision to award prejudgment interest rests in the trial court's

discretion; the purpose of prejudgment interest is to compensate plaintiffs for the lost time value of money. *Michaels v. Michaels,* 767 F.2d at 1204; *Sanders v. John Nuveen & Co., Inc.,* 524 F.2d 1064, 1075 (7th Cir.1975), *vacated and remanded on other grounds,* 425 U.S. 929, 96 S.Ct. 1659, 48 L.Ed.2d 172 (1976). Maremont's fraud caused the Rowes monetary damages, so the Rowes lost the time value of that money. The district court did not abuse its discretion in awarding the Rowes prejudgment interest.

■ Maremont also contends that if prejudgment interest is appropriate, the district court should have used the Illinois prejudgment statutory interest rate of five percent, Ill.Ann.Stat. ch. 17, para. 6401 (Smith–Hurd 1981) instead of the Illinois postjudgment rate of nine percent, Ill.Ann. Stat. ch. 110, para. 2–1303 (Smith–Hurd Supp.1987). Maremont notes that Illinois courts have applied the prejudgment interest rate to common law fraud actions. *See, e.g., Forrester v. State Bank of East Moline,* 52 Ill.App.3d 34, 6 Ill.Dec. 957, 963, 363 N.E.2d 904, 910 (1977). Maremont asserts that it would be inequitable to apply the higher Illinois postjudgment rate in a Rule 10b–5 action because of the plaintiff's lower burden of proof in a Rule 10b–5 action.

The district court did not abuse its discretion in applying the Illinois postjudgment interest rate. The Illinois prejudgment interest statute applies to written contracts or liquidated sums, so it does not apply to the facts in this case. *See* Ill.Ann.Stat. ch. 17, para. 6402. More important, prejudgment interest is meant to compensate plaintiffs for income lost from the lost time value of money. The higher postjudgment interest rate is closer to, though still lower than, the average monthly yield of three-month Treasury bills during the relevant time period. Thus, the postjudgment rate better compensates the Rowes for lost income on their damages. *Cf. Western Pacific Fisheries, Inc. v. SS President Grant,* 730 F.2d 1280, 1288–89 (9th Cir. 1984) (in an admiralty case, the appropriate measure of prejudgment interest is the rate the lost damages would have earned if invested in short-term, risk-free obligations).

Maremont finally contends that the district court erred by awarding the plaintiffs excessive costs. Maremont filed a motion in the district court to reduce the costs awarded. The district court ruled that the motion was untimely. We agree.

Fed.R.Civ.P. 54(d) provides that a party against whom costs are taxed may obtain district court review of the costs by serving a motion within five days after the clerk taxes the costs. Maremont argues that the clerk never taxed costs, so the time limit in Rule 54(d) did not begin to run. However, Maremont received the district court's judgment awarding costs on September 12, 1984. That judgment, signed by the district court clerk, was the taxation of costs. The judgment informed Maremont exactly how much in costs it had to pay. Maremont did not serve its motion to reduce costs until September 24, 1984, outside Rule 54(d)'s five-day time limit. Therefore, the motion was untimely, and the district court did not have to consider Maremont's challenge to the costs taxed.

For the reasons expressed above, we affirm the district court's judgment in all respects. Each party shall bear its own costs on appeal.

AFFIRMED.